## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF TENNESSEE

#### FOR THE

## NASHVILLE, DECEMER TERM, 1918.

---

JAMES A. YOWELL *et al. v.* UNION CENTRAL LIFE INS. CO. *et al.*

### (*Nashville.* December Term, 1918.)

1. **INSURANCE.** Agents. Construction of contract. Surrounding circumstances.

The chancellor in construing a contract between an insurance company and its agent should look to the relation of the parties, the object to be accomplished, and the general circumstances attending its execution, to determine whether the agent was entitled to renewal commissions after the termination of the contract. ·(*Post, pp.* 74-88.)

Cases cited and approved: Lewis v. Atlas Mutual Life Ins. Co., 61 Mo., 534; Wells v. National Life Association, 39 C. C. A., 476; Stowell v. Greenwich Ins. Co., 20 App. Div., 188; Stamper v. Venable, 117 Tenn., 557; McKay R. R. Co., 133 Tenn., 590; Perkins Oil Co. v. Eberhart, 107 Tenn., 409; Hardwick v. Can Co., 133 Tenn., 657;

2. **INSURANCE.** Contract of Agency. Renewal commissions.

Under a contract between an insurance company and an agent, *held*, that the parties meant to confine renewal commissions under former contracts to the continuance of the present contract. (*Post, p.* 88.)

3. **INSURANCE.** Contract of agency. Construction.

Where a representative of an insurance company draws up a contract of agency, the contract, in cases of doubt, will be construed most strongly against the company. (*Post, pp.* 89, 90.)

70

Case cited and approved: Perkins Oil Co. v. Eberhart, 107 Tenn., 409.

4. **CONTRACTS. Construction. Practical interpretation.**

The rule concerning practical interpretation of the parties themselves only applies in cases where contract is ambiguous and intention doubtful, and even then it ought to appear with reasonable certainty that acts alleged to have been performed in the construction of the contract were voluntary acts of both parties, performed with knowledge of the terms of the contract and in view of a purpose at least consistent with that to which they are sought to be applied. (*Post, pp.* 90, 91.)

Cases cited and approved: State ex rel. v. Vanderbilt University, 129 Tenn., 279; Topliff v. Topliff, 122 U. S., 121; Sternbergh v. Brock, 225 Pa. 279.

Case cited and distinguished: Chicago v. Sheldon, 9 Wall., 50.

5. **INSURANCE. Contract of agency. Practical construction by parties.**

Mere fact that general agent of insurance company continue to pay renewal commissions to a subagent, who had terminated his contract, did not show a practical construction to effect that subagent was entitled to renewal commissions; it not being shown when company first received notice of cancellation of contract. (*Post, pp.* 91, 92.)

Cases cited and approved: Cerny v. Paxton & Gallagher Co., 78 Neb., 134.

6. **PAYMENT. Recovery. Burden of proof.**

To recover money paid though mistake of fact, burden is on plaintiff to show that payments were in fact made under a mistake of fact. (*Post, pp.* 92-94.)

Case cited and approved: Dolvin v. American Harrow Co., 125 Ga., 699.

---

FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County. —Hon. John Allison, Chancellor.

DOUGLAS & NOWEL, for appellants.

THOS. J. TYNE, for appellees.

MR. MALONE, Special Justice, delivered the opinion of the Court.

This case turns upon the construction of a contract between insurance agents and the company.

The contract in question, dated July 1, 1912, was made between James A. Yowell and his son, Joel E. Yowell, as subagents, the firm of Dabney & Martin, as general agents, and the Union Central Life Insurance Company. It was the last of several agency contracts to which the complainants, James A. and Joel E. Yowell, and the defendant, Union Central Life Insurance Company, were parties.

The Yowells filed the original bill against both of the other parties to the contract: Against Dabney & Martin on the theory that under a proper construction of the contract they were bound to pay certain renewal commissions under former contracts estimated at about $6,000; against the Union Central Life Insurance Company upon the theory that it prevented its general agents, Dabney & Martin, from carrying out their contract.

The complainants contend that the future renewal commissions, or their value, are proximately ascertainable by the calculations of actuaries, citing Sedgwick on Damages (9th Ed.), section 834e; *Lewis* v. *Atlas Mutual Life Insurance Co.*, 61 Mo., 534; *Wells* v. *National Life Association*, 39 C. C. A., 476, 99 Fed., 222, 53 L. R. A., 33; *Stowell* v. *Greenwich Ins. Co.*, 20 App. Div., 188, 46 N. Y. Supp., 802.

But in the view which we take of this case, it is not necessary to pass upon this insistence.

It is further contended for the complainants:

(1)  That under a proper construction of the contract they are entitled to the value of these renewal commissions.

(2)  That the contract has been so construed by the parties, and certain renewal commissions actually paid; and that the defendants are bound by this practical construction.

The defendants insist:

(1)  That the contract is plain and unambiguous, and that by its terms the Yowells are not entitled to these renewals.

(2)  That the renewal commissions actually paid were paid by mistake, and the answer is filed as a cross-bill to recover the same.

(3)  That the Yowells entered into the contract with the deliberate intention of not performing, and that this was a fraud on their part which precludes them from obtaining a decree.

The chancellor was of the opinion that the contract on its face was free from ambiguity, and that under its terms the Yowells were not entitled to these renewal commissions.  He declined to consider the evidence offered to prove the circumstances preceding and attending the execution of the contract, the previous relations of the parties, etc.

A decree was accordingly entered dismissing the bill, and allowing a recovery under the cross-bill for the renewal commissions actually paid.

From this decree the present appeal is prosecuted by the complainants.

First. In deciding whether the chancellor correctly construed the contract, we think it proper to look to the relation of the parties, the object to be accomplished, and the general circumstances attending its execution. The chancellor should have done this. *Stamper* v. *Venable,* 117 Tenn., 557, 97 S. W., 812; *McKay* v. *R. R. Co.,* 133 Tenn., 590, 182 S. W., 874; *Perkins Oil Co.* v. *Eberhart,* 107 Tenn., 409, 64 S. W., 760; *Hardwick* v. *Can Co.,* 113 Tenn., 657, 670, 88 S. W., 797.

As stated by Chief Justice Neil in the case last cited:

"It is the duty of the court . . . to ascertain, if it can, the meaning which the contract bore in the minds of the parties, and to enforce that meaning or intention. For the purpose of discovering this intention, we must view the situation of the parties and their surroundings so as to place ourselves in the position which they occupied, and thus be able to see the things spoken of in the contract as they saw them."

The rather voluminous record discloses these facts:

For many years preceding the execution of this contract, the defendant Union Central Life Insurance Company had maintained two general agencies in the State of Tennessee, instead of one, as was customary. One of these offices was under the direction of complainant James A. Yowell; the other under the direction of a Mr. Martin. Each of these general agents took in his son as a partner.

There was jealousy and friction between these two offices, and the condition was unsatisfactory to the company.

Mr. James A. Yowell had been with the company many years, and it is not denied that he was highly successful in getting business for the company. It appears that from 1897 to 1908 he wrote annually from $225,000 to $475,000 of insurance.

In 1903 he took in as a partner his son, the complainant Joel E. Yowell, and under date of August 1, 1903, a new contract was made between the company and the Yowells.

On May 16, 1908, another contract was entered into between the Yowells and the defendant, Union Central Life Insurance Company, by which the size of the commissions allowed under the former contract was materially reduced; this being done at the company's request in view of certain adverse legislation.

In 1909 the complainant Joel E. Yowell retired from the firm of Yowell & Yowell, and his father formed a partnership with the defendant C. C. Dabney. Thereupon a new contract, dated March 15, 1909, was made between the company and the firm of Yowell & Dabney. Under this contract the new firm worked for the next three years, during which time Dabney proved himself a very efficient agent for the company.

In the latter part of 1911, Mr. Martin, the other general agent, died, and was succeeded by his son, and surviving partner, the defendant J. B. Martin.

In March and April, 1912, an effort was made to arrange a definite division of the State between Yowell & Dabney and J. B. Martin; and a Mr. Hommeyer, assistant superintendent of agencies, was sent by the company to Nashville to assist in the contemplated division.

About June 12, 1912, Mr. Hommeyer again came to
Nashville with the idea of completing this arrangement,
but was unsuccessful; Mr. Yowell refusing to go on
with it.

The question then arose as to Dabney buying out
Yowell's interest in the partnership; the officials of
the company apparently having the idea that Dabney
would prove more tractable than Yowell, and that a
consolidation of the rival agencies could be arranged
between him and Martin, if Mr. Yowell should be elimi-
nated. Nothing was said to Yowell of the proposed con-
solidation.

Through the efforts of Mr. Hommeyer, a give or take
proposition of $10,000 was submitted to Mr. Yowell,
and he elected to sell to Dabney.

A written contract was accordingly entered into on
June 14, 1912, by the terms of which Dabney purchased
Yowell's interest under the contract of March 15, 1909,
with certain reservations not necessary to mention. He
did not sell his rights under former contracts.

On the same afternoon (and really as part of the
same transaction), a written agreement was made be-
tween complainant James A. Yowell and Hommeyer,
acting on behalf of the company, by the terms of which,
in consideration of the sale to Dabney and the surren-
der of the contract of Yowell & Dabney, it was agreed to
draft a new ten-year contract with Mr. Yowell.

The two significant features of this proposed contract
were:

(1)  That Mr. Yowell should have a "direct contract"
with the company; i. e., he would not hold by sub-

contract with the general agent, but would contract with the company itself.

(2)   That he should have a "vested right" in his renewals; by which it was meant that Yowell would secure his renewal commissions under any circumstances, even though he might voluntarily leave the service of the company.

This agreement was made "subject to the approval of the company."

After these papers were executed, Mr. Yowell was for the first time informed that Dabney & Martin had consolidated and that this new firm was to be made general agent for the whole State.

It seems evident that Mr. Yowell would not have sold out if he had known of the proposed consolidation of the two agencies, and it is to be inferred that the proposed new ten-year contract with its features of "direct contract" and "vested renewals" was used by the company's representative in the nature of a bait to induce him to sell.

However this may be, the company, after the consolidation was accomplished, wrote Mr. Yowell under date of June 19, 1912, that the arrangement contemplated in Hommeyer's agreement would not be approved. In short, the company refused to give him either the "direct contract" or the "vested renewals."

Under all these circumstances, Hommeyer, on June 21, 1912, again came to Nashville, and on that day the contract now in question was drafted.

It is not disputed that the contract was drawn on a printed form of the company; the blanks being filled in

typewriting, and there being certain typewritten addenda as hereinafter shown. It is further agreed on all sides that Mr. Hommeyer dictated the typewritten portions of the agreement.

The contract recites that it is made on July 1, 1912, between "Dabney & Martin, Managers," party of the first part, and Yowell & Yowell, party of the second part, and the Union Central Life Insurance Company, party of the third part.

The term is for ten years, and the territory is:

"Davidson county, in the State of Tennessee, not exclusive, and such privilege in other territory as may be agreed upon."

Like previous contracts between the company and the Yowells, it is divided into fifteen printed sections or headings, entitled respectively: "(1) Appointment," "(2) Term," "(3) Territory," "(4) Commissions," "(5) Supplies," "(6) Readjustment," "(7) Relations," "(8) Bond," "(9) Service," "(10) Reports," "(11) Collections," "(12) Cancelled policies," "(13) Records," "(14) Authority," "(15) Termination," and a typewritten section, "No. 16 Office."

This contract differs from previous ones to which the Yowells were parties, in that it is a contract for a subagent, and not a general agents' contract. The language used is, however, in many respects the same as that of the previous contracts.

The controversy arises especially over the printed sections, No. 4, entitled "Commissions," and No. 7, entitled "Relations," together with the typewritten addenda thereto.

Printed section No. 4, reads, in part, as follows:

"4.  Commissions—That the party of the first part (Dabney & Martin) will pay to the party of the second part (Yowell & Yowell), as compensation for services rendered, commissions in accordance with the following table of rates: [Here follows table.]

"That no commissions shall be payable on interest; or after the termination of this contract, except such as may accrue on notes secured prior thereto."

Then, in typewriting: "(See below.)"

Below, following printed section No. 15, appears a typewritten addition, which contains a special provision as to renewals under former contracts, as follows:

"Renewals—Former Contract.—That the party of the first part will pay to the party of the second part, provided this contract remains in force, the balance of nine renewal commissions of three (3) per cent, on endowment policies paid by less than twenty annual premiums, and five and one-half (5½) per cent. on all other forms of policies, from the date of each particular agency, on the business heretofore belonging to the agency of Yowell & Dabney, secured prior to March 15, 1909, and on the personal business of Jas. A. Yowell secured between June 15, 1912, and July 1, 1912, and five (5) per cent. on the personal business of Joel E. Yowell secured subsequent to March 15, 1909; as the premiums are collected in cash, less commissions, if any, due subagents.

"Collection Fee.—That the party of the first part will pay to the party of the second part, during the continuance of this contract, a collection fee of one-half (½) of one (1) per cent. on all business covered by the sec-

tion 'Renewals—Former Contract,' after the completion of the payment of the renewals therein specified.''

It will be noted, by the language italicized, that all renewals under former contracts dealt with by this typewritten addition are limited to, and dependent upon, the continuance of the present contract.

Printed section 7 is as follows:

''7. Relations.—That, should the contract which is now or may hereafter be in existence, between the parties of the first and third parts (i. e., between Dabney & Martin and the company) be terminated in any manner, the party of the second part (Yowell & Yowell) shall thereupon become the agent of the third party, or of such successor as it may designate; and that the provisions of this contract as to the obligations and compensations of the said party of the second part shall define the rights of the said second party with the party of the third part. But nothing herein shall be construed to require the party of the third part to pay the party of the second part any commissions which became payable to him before the termination of the contract between the parties of the first and third parts.''

Then, in typewriting: (''See below.)''

Below, immediately following the *addendum* to section 4, appears this typewritten section:

''No. 7. Relations—Renewal Rights.—That the party of the first part will pay the balance of nine (9) renewal commissions from the date of each particular policy, provided the party of the second part continues to serve until the expiration of this contract; or if he refuses to accept any of the adjustment as provided in article 6; or in the event of the death of either party of

the second part; or in the event of the withdrawal of the party of the third part from the aforesaid territory.

"That the party of the first part will pay five (5) renewal commissions, but not to exceed nine (9) on any one particular policy from its original date, in event of the cancellation of this contract on account of the failure of the party of the second part to comply with any of the provisions of the third paragraph of article 15."

Section 15 above mentioned is for the most part printed, and is in part as follows:

"That this contract shall be terminated in event that the party of the third part shall withdraw from the territory assigned; or should be prevented for any cause, from doing business in the territory in which the party of the second part is operating.

"That this contract shall be null and void, at the election of the party of the first part, or, on his failure to act, at the election of the party of the third part, if the party of the second part shall fail—" (to do certain things specified,) "or . . . shall fail to secure, deliver and pay for $100,000 of insurance during the remainder of 1912, and $200,000 annually thereafter."

All the above is in printed form except the italicized figures.

Then comes this typewritten addition:

"That in the event of the death or retirement of either party of the second part the surviving or remaining partner shall have the option of continuing this contract."

The present controversy, as above stated, is waged over these provisions of the contract.

The complainant J. A. Yowell, having quit the service of the company, under circumstances hereinafter set forth, and the general agents, Dabney & Martin, having undertaken, at Joel Yowell's request, to cancel his contract within six months of the date of the contract, for failure to write the required quota of $100,000, the question arises: Are the Yowells entitled, since the termination of the contract, to renewal commissions arising under former contracts as described in the *addendum* to section 4?

If these renewals fall exclusively under section 4 and its typewritten *addendum,* it seems evident that they would not be so entitled, because the rights given by these clauses of the contract are expressly made dependent on the continuance of the contract.

But if the typewritten *addendum* to section 7 covers all classes of renewals, both those arising under the present contract, and those arising under former contracts, a different case is presented. For this *addendum* to section 7 contains a stipulation that Dabney & Martin will pay five renewal commissions, etc., in the event of the cancellation of the contract by reason of the failure of the Yowells to comply with any of the provisions of the third paragraph of article 15; one of said provisions relating to cancellation for failure to write the annual quota of $100,000.

Before deciding this question, it will be helpful to consider other facts attending the execution and termination of the contract.

There is in many respects a conflict between the parties as to what took place in the discussion when the contract was drawn; the complainants testifying one

way, and Hommeyer and Dabney the other.  Martin was not present.

On one circumstance, however, all agree, viz. that Mr. James A. Yowell stated that he might wish to retire to his farm and that he wanted his son Joel in that event to continue the contract for his (Mr. Yowell's) benefit.

This request was granted and Joel E. Yowell was made a party to the contract, and the following typewritten addition was accordingly inserted:

"That in the event of the death or retirement of either party of the second part the surviving or remaining partner shall have the option of continuing the contract."

The contract was signed by the Yowells on June 21, 1912.  It was not signed by the company until some days later—possibly July 4th or 5th.  But the Yowells considered it in force from June 21st (as they testify) and went to work under it with great enthusiasm.  They turned in one application on June 21st, the very day of signing the contract; another on June 26th; another on July 2d.  Some of this business necessitated trips to an adjoining county.

On June 24th trouble arose under the new contract in connection with the publicity given in the daily press to the consolidation of the agencies of Dabney & Martin and the retirement of Mr. Yowell as general agent.

Mr. Yowell says he knew that Mr. Dabney had a weakness for advertising through the newspapers, and that Mr. Hommeyer promised him that the publicity features would be handled through the home

office and that he (Yowell) would have as much promi-
nence as he had enjoyed under his former contract
with the company.

On June 24th articles appeared in the daily press
highly laudatory of Dabney & Martin, but saying very
little about Mr. Yowell, and making it appear that he
would be retained in a subordinate capacity.

On June 25th Mr. Yowell wrote the home office in-
closing copies of the article, reminding the company
of Hommeyer's promise, and asserting that he "was
not getting a square deal." The company took no no-
tice of this letter.

Mr. Yowell felt greatly "humiliated" (to quote his
language) by this treatment. He continued working
for several days, as already shown; but, when it
became evident that the company was ignoring his
letter, he felt much chagrined, and that he could not
longer remain in its employ without sacrificing his
self-respect.

The contract came back from Cincinnati signed on
behalf of the company on July 4th (as the Yowells
say), or on July 6th (as defendants say). At any
rate, as soon as it was received, the Yowells consulted
their counsel as to the meaning of the typewritten ad-
dition to section 7 and as to what their rights would
be in case they both quit the company. Under counsel's
advice, Joel Yowell was sent to Cincinnati on the same
day to have the company put a written construction up-
on the contract in line with the Yowell's statements
as to what the intention of the parties was. It is
claimed that Mr. Hommeyer did write a letter giving
the contract the desired construction, and it is ad-

mitted that his superior officer refused to sign this letter.

There is also evidence tending to show that Mr. James A. Yowell, before sending his son to Cincinnati, asked Mr. Dabney to write the home office requesting that the contract be amended so that the Yowells might get their renewals even if they went to another company. This like much else in the record, is controverted; but the point to be noted is that the Yowells who before these newspaper publications had gone to work writing insurance with the utmost enthusiasm—not even waiting for their contract to be formally executed and delivered —were now chiefly concerned with its termination and with the effect this would have on their renewals.

Mr. James A. Yowell made no effort to write any other business for the company, and under date of July 13, 1912, wrote Dabney & Martin as follows:

"Dear Sirs: In accord with my contract with you of July 1, 1912, I hereby notify you of my retirement and Mr. Joel E. Yowell will continue to act under the contract."

On July 14th he discussed with a representative of the Penn Mutual the question of writing insurance for that company, and on July 15th signed a formal contract in this behalf.

Joel E. Yowell remained with the company for some six months longer, but wrote no substantial business during that time.

It is not denied that in October, 1912, he had a talk with the defendant Martin and expressed his desire that Dabney & Martin cancel his contract.

Accordingly, under date of January 7, 1913, Dabney & Martin wrote Joel E. Yowell:

"Upon examination of our records, we find that you failed to produce the required amount of paid for business from July 1st to December 31st, 1912, as called for in article 15, paragraph 3, of your contract bearing date of July 1st, 1912, and inasmuch as you stated to Mr. J. B. Martin in October that you would like for us (Dabney & Martin) to cancel your contract, we hereby notify you that your contract dated July 1st, 1912, terminated January 1st, 1913. Kindly return passbooks, contract and other supplies belonging to the Union Central, and oblige."

Coming now to the construction of the contract, it may be noted in the first place that the language of the addendum to section 7 is taken almost *verbatim* from the previous contracts of 1908 and 1909. It seems to be a part of the printed form of those contracts between the general agents and the company, which for some reason was omitted from the printed form for sub-contracts, although the record contains no direct evidence on this point.

If our inference be correct, such a provision in the printed form would more naturally refer to renewals under that particular contract; and, as we have seen, renewals under former contracts seem in every instance to have been covered by typewritten additions.

But a more significant circumstance is this:

The Yowells, at the time they signed the contract, had no thought of leaving the company or of working for any other company. The contract, in the addition to section 4, specifically reserved these renewals on

former contracts during the continuance of the contract; and by the addition to section 15, Mr. Yowell was permitted to retire at any time and his son could continue the contract. There is no doubt on the record that this particular clause was inserted to permit him to retire to his farm should he feel so inclined.

Other parties so testify, and, speaking of his conversation with Hommeyer at the time the contract was drawn, Mr. Yowell himself says:

"Q. Then that provision was placed in the contract at your instance and for your benefit?

"A. And heartily co-operated in by Mr. Hommeyer, as he stated he wanted to protect my old business."

This was the way, then, in which the old business was to be protected—Mr. Yowell expected to stay with the company unless he retired to his farm, in which event Joel Yowell would keep the contract going for his father's benefit as well as for his own.

The Yowells both testify as to the father's pride in the company, and his belief that he really could not talk insurance or write insurance for any other company.

We cannot believe that such an idea as voluntarily leaving the company, or working for another company, was present in the mind of either of them when the contract was signed.

Moreover, the Yowells knew from the written refusal of the company to approve Hommeyer's arrangement that the company would not give him a "vested interest" in these renewals; i. e., secure them to him absolutely.

It is earnestly argued that this letter of refusal only referred to one of the matters covered by this memorandum, viz. the "direct contract." But we do not think its language can be so restricted. Again, Mr. Yowell himself comments upon the entire failure of the Hommeyer tentative agreement.

The Yowells, we think, did not mean to cover in the present contract the contingency of voluntarily leaving the company and going to work for another, because no such contingency was in their minds.

It was only when Mr. James A. Yowell was humiliated (as he thought) by the publicity incident, and by the failure of the company to set him right, that he began to consider this. Then came the doubt as to the meaning of the contract, and consultation with counsel, the conversation with Dabney, the sending of Joel Yowell to Cincinnati—all apparently with the idea of ascertaining whether the addition to section 7 could be made to cover such a contingency.

When all these circumstances are considered, the correct construction of the contract is plain. The parties meant to confine the renewals under former contracts to the continuance of the present contract, and this was specifically stated in section 4 and its typewritten addition.

The typewritten addition to section 7 was apparently modeled from the printed forms of previous contracts, and its general language was meant to apply only to renewals arising under the present contract.

The chancellor therefore reached a correct conclusion as to the meaning of the contract.

It is true, as argued by the appellant's counsel, that the company's representative, Hommeyer, drew the contract, and that an instrument, in cases of doubt, will be construed most strongly against the party in whose behalf it was drawn. *Perkins Oil Co.* v. *Eberhart,* 107 Tenn., 409, 416, 64 S. W., 760.

But, giving the Yowells the full benefit of this principle, as against the company, the contract itself, when read in connection with the facts and circumstances shown by the record, makes it impossible to sustain the appellants' contention.

We are also inclined to agree with some of the criticisms made by appellants' counsel on the conduct of the defendants, or some of them.

It seems evident that the intention to consolidate the agencies of Dabney & Martin was not disclosed to Mr. Yowell, and that he would not have sold out his interest to Dabney had he been advised of such intention. While the term ''concealment'' is too strong, there was perhaps a certain lack of frankness in this behalf.

It seems further probable that the promise of a ''direct contract'' was used, to some extent, as a bait to induce Mr. Yowell to enter into the arrangement, and thus eliminate him as a factor in the troublesome situation arising from the two general agencies; and that this was done with the knowledge of the company.

It appears, moreover, that Mr. Yowell had some cause for complaint with regard to the publicity incident. According to his testimony, there was a distinct understanding with Mr. Hommeyer about this, and Mr. Hommeyer does not contradict him. This

incident can hardly be dismissed as trivial; for, in the business of life insurance, advertising and publicity seem to be legitimate and vital factors.

But, conceding all this, the present suit is not one to rescind the contract on account of fraud, if indeed such a suit could have been maintained—a matter not before the court. The present suit is based on the contract, and the appellants are claiming under it and basing their contentions upon its construction.

We think the chancellor reached a correct result as to the meaning of the contract.

Second. It is, however, argued with force and ability that there was a practical construction of the contract by the parties themselves contrary to the conclusion which we have reached, and that this is binding.

The principle involved is, of course, well established. *State ex rel.* v. *Vanderbilt University*, 129 Tenn., 279, 329, 164 S. W., 1151; *Chicago* v. *Sheldon,* 9 Wall., 50, 54, 19 L. Ed., 594; *Topliff* v. *Topliff,* 122 U. S., 121, 131, 7 Sup. Ct. 1057, 30 L. Ed., 1110; Elliott on Contracts, volume 2, section 1537.

As stated by the United States supreme court in the leading case of *Chicago* v. *Sheldon,* supra:

"In cases where the language used by the parties to the contract is indefinite or ambiguous, and hence of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence."

It is equally well settled, however, that this rule only applies in cases where the contract is ambiguous and the intention doubtful; and "it ought to appear with reasonable certainty that acts alleged to have been per-

formed in the construction of the contract were in fact the voluntary acts of both parties performed with knowledge of the terms of the contract and in view of a purpose at least consistent with that to which they are sought to be applied." Elliott on Contracts, volume 2, sections 1541, 1542; Page on Contracts, volume 2, section 1126; *Sternbergh* v. *Brock,* 225 Pa. 279, 74 Atl., 166, 24 L. R. A. (N. S.), 1078, 133 Am. St. Rep., 877.

The facts chiefly relied on by appellants to bring the case within the general rule are, in substance, these:

That while the contract was cancelled as of January 1, 1913, Dabney & Martin continued to pay renewal commissions on business under former contracts until some time in March, 1913, when the company wrote to the Yowells, under date of April 30, 1913, stating that these commissions had been paid by mistake and requesting their repayment.

The record shows, however, that the company was ultimately paying this money—not Dabney & Martin—and, while it allowed these payments to Dabney & Martin, it is not clearly shown just how and when the company received notice of the cancellation of the contract. The auditor of the company would seem to have been the official who could give this explanation, and, while some letters of his appear in the record, neither side took his deposition.

Dabney & Martin seem to have been quite willing to pay the renewals so long as the company made no objection; for it was the company's money, not theirs. And the record shows that they would have continued to pay if they had not been ordered by the company to discontinue.

But both Dabney and Martin testify that they construed the contract differently from the Yowells, and that their construction of the contract was stated to the Yowells in conversations which are detailed. While the evidence of the Yowells tends to contradict this, it seems evident that the record fails to show such a practical construction by both parties as is contemplated by the rule, even if the contract be sufficiently ambiguous to permit its application.

Third. Did the Yowells enter into the contract without any intention of keeping it?

The defendants' counsel relies upon the principle that the making of a promise with deceitful purpose, by one having no intention of fulfilling it, is a fraud which will avoid a contract, citing *Cerny* v. *Paxton & Gallagher Co.*, 78 Neb., 134, 110 N. W., 882, 10 L. R. A. (N. S.), 640, and authorities reviewed in the case note; and these authorities seem to sustain his insistence.

But, even if the rule invoked could apply under the pleadings in the present state of the record (a matter not necessary to decide), we find no facts to warrant its application.

As already stated, the record clearly shows that the Yowells signed this contract about June 21, 1912, and went to work under it with enthusiasm. We think they had the intention of performing their agreement at the time they entered into the contract.

Fourth. Can the recovery allowed by the chancellor under the cross-bill be sustained?

As heretofore stated, the company continued paying renewals (or rather allowing Dabney & Martin credit

for paying renewals), for some weeks after the cancellation of the contract by Dabney & Martin. The aggregate sums so paid amount to $482.03, and for this the chancellor gave a decree to the company, under its cross-bill.

The cross-defendants Yowell filed a demurrer and answer resisting the relief sought on various grounds —among others, that the payments by Dabney & Martin were voluntary; that no fraud or collusion was charged between the Yowells and Dabney & Martin; that the payments were made under pure mistake of law.

The question of mistake of law as to the effect of an instrument has been much discussed. See case note to *Dolvin* v. *American Harrow Co.*, 125 Ga., 699, 54 S. E., 706, as reported in 28 L. R. A. (N. S.), 785. But we find it unnecessary to pass upon this point.

The allegation of the cross-bill was ''that these payments were made without its (the company's) authority or knowledge,'' and the issue thus presented was one of fact.

The chancellor, as already stated, refused to hear any evidence in this case.

Had he done so, he probably would not have sustained the recovery under the cross-bill. The burden was on the company, under its cross-bill, to make out a mistake of fact, to show just how and when it received notice of the termination of the agreement, and why these payments were allowed in the reports of Dabney & Martin; and, even if it could overcome the legal propositions advanced by the demurrer, it has failed to support this burden.

The result is that the chancellor's decree will be modified so as to dismiss the crossbill, as well as the original bill.

The costs will be equally divided between the Yowells and the Union Central Life Insurance Company.

Mr. Justice WILLIAMS, being incompetent, took no part in the hearing or decision of this case.