STANDARD OIL COMPANY OF LOUISIANA, COMPLAINANT, AP-
PELLEE, *v.* PETROLEUM PRODUCTS STORAGE COMPANY,
DEFENDANT, APPELLANT..

*(Nashville*, December Term, 1931.)

Opinion filed December 21, 1931.  Petition for certiorari granted May
2, 1931.

BURCH, MINOR & McKAY, for complainant, appellee.

ADAMS, DONELSON & POPE and WILSON, KYSER, ARMSTRONG & ALLEN, for defendant, appellant.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

Defendant is a local distributor of gasoline at Memphis. It contracted, in May, 1927, with complainant for gasoline over a one year period, the amount of 300,000 gallons originally named, being later increased to 1,000,000. The price was thus fixed by the contract:

"For the Navy Gasoline delivered hereunder, the 'Purchaser' shall pay the 'Seller' on the basis of the 'Seller's' tankwagon price (exclusive of tax) for 'Standard' Gasoline in effect at Memphis, Tenn., on the date of each shipment, less a discount of three decimal sixty cents (3.60c) per gallon; except that it is understood that should the 'Seller's' tankwagon price (exclusive of tax) for 'Standard' Gasoline in effect at Memphis, Tenn., less the discount of three decimal sixty cents (3.60c) per gallon, at any time during the period of this contract make the net price to be paid by the 'Purchaser' to the 'Seller' greater than the 'Seller's' open tank car price, F.O.B. 'Seller's' refinery, North Baton Rouge, Louisiana, plus transportation and inspection charges to Memphis, Tenn., the 'Seller' shall then charge the 'Purchaser' on the basis of the 'Seller's' open tank car price F.O.B. 'Seller's' refinery, North Baton Rouge, Louisiana, in effect on the date of each shipment to the 'Purchaser.'

The following difference arose as to the construction of this contract: Standard Oil issues a weekly publication in which current prices of gasoline are quoted for various points, including Memphis. Complainant insists that this published price is the "basis" referred to in the contract, from which this buyer was to deduct 3.60c per gallon discount; while defendant insists that the "basis" intended was the actual tank wagon price "in effect," that is being used, on the date, or at the time, of each shipment.

It has been concurrently found, in effect, that Standard Oil had been accustomed prior to the making of this contract to make occasional concessions to some buyers in varying amounts, and that defendant's officers knew this; and, further, that beginning in July and continuing for some months, Standard Oil, to meet competition, practiced this quite generally. The pertinent facts are thus clearly stated by the Chancellor:

"Up to about July 1, 1927, the complainant adhered very generally to its published tank-wagon price to the retail dealer, and its published tank-wagon price was generally recognized as the market tank-wagon price. Prior to that time the complainant and the other producers were making some concessions from the published tank-wagon price to a few retail dealers, and this fact was known to the defendant during the time of the negotiations leading up to this contract. But this was the exception rather than the rule. The parties were discussing the contract for some two months before the terms were agreed upon; during these negotiations the defendant was insisting upon a greater allowance or concession from the complainant's tank-wagon price, meaning of course its published price which determined the market price. About July 1, when the complainant began the general practice of allowing concessions from its open tank-wagon price to the retailers, the other producers and wholesale dealers, including the defendant, were compelled to meet its price. It cost the defendant approximately 1.88 cents per gallon to operate its business; and the result was that in order for it to compete with complainant and the other wholesale dealers after July 1, it was compelled to do business at a loss if it purchased at complainant's open tank wagon price less 3.60 cents per gallon."

It thus appears that before July 1 the published price was generally the same as the actual price, and that a cut, or concession, price below this was the exception. While later the general practice was the reverse, that is to sell in Memphis at prices below the published price.

Now, assuming, or conceding, as a premise, that the language of this provision of the contract is in doubt, requiring construction, complainant invokes the settled rule that the circumstances and knowledge of conditions of the parties at the time of its making may be looked to in arriving at the intention, and urges that defendants knew that complainants issued or published weekly a basis price of gasoline at Memphis, and knew also that concessions were commonly made therefrom, and contracted with these conditions or facts in mind; and, further, that invoice payments made by the defendant under the contract, after the practice of selling generally at prices below the published price became general and known to defendant, calls for application of the "practical construction by the parties" rule.

On the other hand, it is insisted for defendant, (1) that this practice prior to and at the time of the making of the contract was occasional only, the exception rather than the rule, and therefore not of material importance as showing intent; and, (2) that the language is not ambiguous, but plain, in that the price "in effect at Memphis" can mean only the actual selling price from tank-wagons on the several dates. And the rule, also well settled, is invoked that if and when ambiguous the doubt in construction is to be resolved against the drawer of the instrument.

It fairly appears that the practice of selling in Memphis at prices below the published price became general —the rule rather than the exception—in July, and was

continued for some months. However, defendant paid the invoices billed on the published price basis without objection until September 1, when the question was raised and complaint made, but defendant continued to pay on the same basis through September and October. It refused payment in November on the ground that its contract had been violated and demanded an adjustment. Complainant sued for the November account in the sum of $12,234.49. Defendant denied liability on the theory that the aggregate of over charges during the running of the contract was the offsetting sum of $8953.02, and sought by cross-bill to recover this over payment. It also set up that upon its refusal of payment of the November account and its assertion of this counterclaim, complainant breached its contract, which had not expired, and refused it further shipments, and that it had thereupon been required to buy from other sources at higher prices to its damage, in the sum of $3590.75, which it also sought to recover. It will be seen that the aggregate of these counterclaims is $12,543.77, or $309.28 in excess of the claim of complainant for its November deliveries for which it sues.

The Chancellor dismissed the cross-bill and gave a decree for complainant, and the Court of Appeals has affirmed. Petition for *certiorari* was granted, and argument has been heard here.

Both the Chancellor and Court of Appeals took the view that the contract was ambiguous, and in construing it looked to the general circumstances heretofore related attending its execution, and held that the *published* price was intended and controlled. To this we are unable to agree. We are unable to escape the conclusion that the language used, ''shall pay the seller on the basis of the seller's tankwagon price (exclusive of tax) for

'Standard' Gasoline in effect at Memphis, Tennessee, on the date of each shipment, less a discount of three decimal sixty cents (3.60c) per gallon," is plain and practically free from ambiguity. The only difficulty apparent is in application,—this being the strongest argument for the published rather than the actual, or "in effect," construction justified by the language. But the sources of information necessary to establish the "basis" and give it application were always available, particularly to the seller.

While the instant case is on its facts to be distinguished, as urged by learned counsel, from *Standard Oil Co.* v. *Wright Oil Service Co.*, 26 Fed. (2d) 895, relied on for the defendant, in some particulars, the language of the contract therein construed was quite similar. It read, "Shall pay to the seller the seller's tank-wagon price (exclusive of tax) for 'Standard' gasoline in effect at Huntington, West Virginia, on the date of each shipment,.less three cents per gallon." To this extent the language in the two contracts is practically identical. The distinction urged rests on the assumption of ambiguity justifying a consideration of attendant circumstances, etc. The main differences relied on are thus summarized by counsel for complainant:

"If it had appeared in the Wright case that the seller had a published price at Huntington; that, before the contract was signed, the parties discussed the very question there at issue; and that it was well understood by both parties that the published price would apply—which was the situation in the case at bar—it cannot be doubted that the court would have applied to the contract the interpretation which the parties had mutually placed on it."

But these differences, in the main, are effective only on the assumption that the language is open to two constructions. In the Wright case the price basis contended for by the Standard Company was that fixed and promulgated periodically from the Standard's New York office. There the price basis contended for by the Standard was "promulgated from plaintiff's New York office." Here it was published in its periodical. The opinion of the Court (Circuit Court of Appeals, Fourth Circuit) is directly applicable:

"The case before us turns upon the meaning of the words 'seller's tank wagon price . . . in effect at Huntington.' If these words refer to the price fixed and promulgated from plaintiff's New York office, without reference to prices actually charged at Huntington, a verdict should have been directed for plaintiff; for there is no question that the gasoline purchased by defendant was billed to it at 3 cents per gallon less than this price. If, however, they refer to the price actually in effect in sales made at Huntington, the motion for directed verdict was properly denied, and the case was properly left to the jury to determine what the price in effect actually was. We think that the latter is the correct interpretation. The words used are nontechnical words, and are to be taken in their plain, ordinary and popular sense. 6 R. C. L., 843. When so taken, there can be no doubt as to their meaning; for they manifestly mean the price at which sales are actually made from plaintiff's tank wagons in Huntington."

And further:

"Plaintiff offered evidence to the effect that under the custom of the trade the words 'seller's tank-wagon price,' as used in the contract, had reference to the tank-wagon price as fixed and promulgated from its New York

office. But there are two reasons why it was not entitled to a directed verdict on this evidence. In the first place, in view of the evidence that for several years prior to the making of the contract the tank-wagon price as promulgated from the New York office was the price actually in effect without discount in sales from tank-wagons in Huntington, the words could not have acquired such a significance that, in the case of a variance between the price as promulgated and the price in effect, they would be said to have reference to the former. In the second place, where the words of a contract are clear and unambiguous, as they are here, they cannot be varied or contradicted by evidence of custom or usage. To give to the words 'seller's tank-wagon price' the interpretation for which plaintiff contends would be to contradict other words of the contract equally. as important; for 'seller's tank-wagon price' is expressly limited by the the words 'in effect in Huntington.' This cannot be done. Usage may be resorted to, 'in order to make definite what is uncertain, clear up what is doubtful, or annex incidents, but not to vary or contradict the terms of a contract.' *Moore* v. *U. S.,* 196 U. S., 157, 166, 25 S. Ct., 202, 204, 49 L. Ed. 428; *The Gazelle,* 128 U. S., 474, 486, 9 S. Ct., 139, 32 L. Ed., 496; *Barnard* v. *Kellogg,* 10 Wall., 383, 394, 19 L. Ed., 987; 17 C. J., 508."

If it was the *published* price, rather than the *actual* price "in effect at Memphis," which the seller intended, how easy it would have been to say so. Apropos, learned counsel for the Standard significantly say, after mentioning that the "Standard" involved in the Wright case was a different corporate entity, "The decision in that case was rendered more than a year after this contract was made. If that decision had been known at the time

this contract was written, the question in the present case would not, of course, have arisen.''

■ This is at least a concession that the seller might have freed the contract from all alleged ambiguity—measurably an admission that the drawer of the contract fell short, and is responsible for the alleged doubt as to the meaning. The well known rule comes into play. *Yowell* v. *Life Ins. Co.*, 141 Tenn., 70; *Perkins Oil Co.* v. *Eberhart*, 107 Tenn., 409.

Moreover, we are unable to conclude, when this contract is tested by the basic ''within the contemplation of the parties'' rule, that the parties mutually intended to contract for a basis so obviously open to a possible result so disastrous to the buyer. If the buyer was bound to buy 1,000,000 gallons within the stipulated time and to pay any price which the seller might choose to publish while the seller remained free to sell in this identica. territory to the buyer's competitors generally at a greatly lower price, then the contract provided for ruinous consequences to the buyer. It is true that the contract was in no sense exclusive; nor did it prevent the making of another, or of more than one other, contract at a lower price; nor did it protect the buyer against occasional sales at a less price, but the manifest intent of the sliding scale provision was to give to the buyer, over a year, of a large quantity, the benefit of all reductions in the price, put in effect at Memphis generally by this seller from time to time throughout the running of the contract. This ''common sense'' reason sustains the view above indicated that it was the actual in effect price basis which was in the contemplation of the parties, rather than the seller's price basis as published from time to time.

Now, finding, as we do, that the contract contemplated and called for, as a basis from which the discount was to

be deducted, the price actually in effect at Memphis at the date of the various shipments, we proceed to a discussion of the rights of the parties on this record.

The contract began running in May 1927. The claim sued on is for November deliveries. The cross-action is for (1) alleged differentials in the price charged for the months prior to November, for which a recovery is sought by way of offset: (2) for an abatement to the extent of such differentials in the claim presented for the November deliveries, and (3) damages for a breach of the contract in refusing further deliveries.

While of opinion that defendant could have insisted on paying on the basis of the contract as above construed as bills were rendered from time to time, we are not of opinion that it can now recover back any part of these payments voluntarily made in settlement of the accounts for previous months. We find no facts here taking this case out of the general rule that, "A person cannot, either by way of setoff or counterclaim, or by direct action, recover back money which he has voluntarily paid with a full knowledge of all the facts, and without any fraud, duress or extortion, although no obligation to make such payment existed." 48 C. J., 734, citing numerous authorities, including our cases of *Hubbard* v. *Martin,* 8 Yerg., 498, and *Gaar* v. *Stark* (Ch. App.), 36 S. W., 149. Other cases are cited by Mr. Shannon in his "Annotations" under *Hubbard* v. *Martin, supra.* For a well reasoned opinion see *Wessel* v. *Johnston L. & M. Co.,* 3 N. Dakota, 160, 44 Am. St., 529. Here, as in that case, there was no mistake, the party had ample opportunity to litigate, knew the facts and its rights, and yet elected to pay the bills as they were presented. That the payments were made under a contract does not change the rule. 48 C. J., 738. There was a dispute

and the seller had a right to know what to expect touching further deliveries. The buyer could not thus fail to assert its rights and then later repudiate its election and recover back.

With respect to the claim unpaid and here sued on the rule of voluntary payment does not apply, and as to this the defendant is entitled to an abatement to the extent of the difference, if any, between the price which has been charged for the November shipments, and the actual price in effect at Memphis at the time of the shipments. It is urged that the November shipments were charged for, not on the Memphis published price basis, but under a second clause of the contract immediately following the clause heretofore discussed and reading thus: ''Except that it is understood that should the seller's tank-wagon price (exclusive of tax) for 'standard' gasoline in effect at Memphis, Tennessee, less the discount of three decimal sixty cents (3.60c) per gallon, at any time during the period of this contract make the net price to be paid by the purchaser to the seller greater than the seller's open tank car price F.O.B. seller's refinery, North Baton Rouge, Louisiana, plus transportation and inspection charges to Memphis, Tennessee, the seller shall then charge the purchaser on the basis of the seller's open tank-car price F.O.B. seller's refinery, North Baton Rouge, Louisiana, in effect on the date of each shipment to the purchaser.''

The record does not clearly and satisfactorily show what the actual, or in effect at Memphis, price basis was for the month of November, and it is necessary that this be established in order to determine whether the November deliveries are properly to be charged under the above exception.

So as to the claim for damages, based on the breach of the contract by complainant in refusing further shipments. While it results from the holding above announced with respect to the true contract basis of price that the contract was breached, the record is not clear as to the amount, if any, of the damages suffered. It is not the province of this Court to work out the calculations involved. These are matters for a reference.

The cause is reversed and remanded to the Chancery Court for a proper reference to report, pursuant to the rulings herein set forth, looking to the proof on file and such additional proof as may be produced, (1) what was the seller's actual tank wagon price (exclusive of tax) for "Standard" gasoline in effect at Memphis on the date of each shipment remaining unpaid for and herein sued for, without reference to the seller's published price; and (2) what is the abatement to which defendant is entitled on this basis, if any, from the claim presented, and (3) what damage, if any, the defendant has suffered by reason of the aforesaid breach.