## PURE OIL CO. v. TUCKER.
### No. 13592.

Circuit Court of Appeals, Eighth Circuit.
Dec. 26, 1947.

Rehearing Denied Feb. 16, 1948.

Ben A. Harper and Gene M. Woodfin, both of Houston, Tex. (Donald Evans, of Des Moines, Iowa, Vinson, Elkins, Weems & Francis, of Houston, Tex., and Evans, Riley, English & Jones of Des Moines, Iowa, on the brief), for appellant.

Howard L. Bump, of Des Moines, Iowa, and Noel D. Shinn, of Knoxville, Iowa (Charles M. Bump, of Des Moines, Iowa, and Joe M. Johnston, of Knoxville, Iowa, on the brief), for appellee.

Before GARDNER, THOMAS and JOHNSEN, Circuit Judges.

THOMAS, Circuit Judge.

The appellant, the Pure Oil Company, an Ohio corporation, is engaged in the business of refining, purchasing, transporting and selling gasoline and other petroleum products. The appellee, L. D. Tucker, a resident of Knoxville, Iowa is engaged in retailing all such products. On September 1, 1939, the parties entered into two written contracts. By the terms of one of the contracts the Oil Company sold to Tucker certain described real estate situated in Iowa for $32,000 payable in monthly installments. In the second contract, called the Supply Contract in the record, the Oil Company agreed to sell to Tucker and Tucker agreed to purchase from the Oil Company all the gasoline and other petroleum products handled by Tucker in the territory in and around Knoxville on the terms stipulated in the contract for a period of five years beginning September 1, 1939.

Tucker defaulted in the payment of the monthly installments provided for in the real estate contract and the Oil Company brought suit in the district court for the unpaid balance of $15,200, for interest and costs, and to foreclose the contract. Tucker answered admitting the material allegations of the complaint and pleaded a

counterclaim for the sum of $10,188.86 based on the charge that the Oil Company, in violation of the Supply Contract, had collected from him that amount, including interest, in excess of the amount which it was entitled to receive under the contract.

The trial court sustained Tucker's contentions and entered judgment in his favor for the alleged overcharges as an offset against the amount due upon the real estate contract. The appeal involves only the issues presented on the counterclaim.

The Oil Company procured all the gasoline furnished to Tucker from refineries in Oklahoma and Kansas designated by the trade as "Group 3" territory. It had no refinery in that territory. The gasoline was at all times transported from Oklahoma to Des Moines, Iowa, by the Great Lakes Pipe Line in which appellant owned an interest, and from Des Moines to Knoxville in railway tank cars or in tank trucks.

Prior to June 11, 1941, the railroad rate for gasoline from Group 3 to Knoxville and the pipe line rate from Group 3 to Des Moines plus the railroad rate from Des Moines to Knoxville were the same. On the date mentioned the Interstate Commerce Commission entered an order requiring the pipe line company to reduce its rate from Group 3 to Des Moines so that thereafter the combination rate through the pipe line to Des Moines and by rail from Des Moines to Knoxville was less than the all rail rate from Group 3 to Knoxville. This differential, the subject of the controversy here, applies only to shipments purchased subsequent to June 11, 1941, when the new reduced pipe line rate went into effect.

The provisions of the Supply Contract involved in the dispute read:

"5. Prices. The price of Purol-Pep gasoline supplied hereunder, except as hereinafter modified, shall be Seller's official delivered tank car price to jobbers therefor prevailing on the date of such shipment from refinery or other storage of Seller for the destination to which shipment is made, as currently posted by Seller at its zone office in Madison, Wisconsin.

"Provided, however, if Seller's delivered price as aforesaid gives to Buyer at point of delivery to Buyer on date of shipment a margin of less than two cents (2c) per gallon below Seller's established normal price to dealers (at point of delivery to Buyer) for tank wagon deliveries of Purol-Pep as currently posted by Seller at its zone office above referred to, then the price of Purol-Pep supplied hereunder shall be two cents (2c) below such established normal dealer price of Seller, (it being understood that Buyer is not obligated to resell to dealers at such prices.)

"It is further agreed that the price of Purol-Pep gasoline to Buyer hereunder f.o.b. Seller's refinery or other storage at Des Moines, Iowa, shall at no time be less than:

"Four and 72/100 cents (4.72c) per gallon when the average price as posted at the well by major purchasers of crude oil for thirty-six (36) gravity Oklahoma crude is fifty cents (50c) and below per barrel.

* * * * * * * * * * * * *

"8. Freight. The terms of sale under this agreement are f.o.b. cars at Seller's refinery or other storage. Rail transportation charges will be paid by Buyer to railway on receipt of shipments at destination. Seller's invoices for gasoline sold at a delivered price will contain an allowance in the exact sum which Buyer pays to the railway on arrival of the gasoline at destination.

"The petroleum products covered by this agreement will be shipped in inter-state commerce from points without the state in which delivery is to be made. When requested by Seller, Buyer shall immediately deliver to Seller receipted freight expense bills to entitle buyer to any credit which may be due him for any freight charges paid by Buyer for shipment hereunder.

"If rate of freight changes during the life of this agreement, the new rate shall apply only to shipments made subsequent to any such change, and the burden, or benefit, arising from any such change of freight rate on shipments made prior to such change will be for account of Seller."

It will be observed that no formula is stated for determining the price of gaso-

line to Tucker. And it is not disputed that the price charged at all times during the continuance of the contract was the Oil Company's official delivered tank car price to jobbers prevailing on the date of shipment from the storage in Des Moines, "as currently posted by Seller at its zone office in Madison, Wisconsin." But the court found that the language of the contract is ambiguous; that looking back of the contract and considering the Oil Company's method of doing business prior to June 11, 1941, the sales price to Tucker should be the Tulsa, Oklahoma, price, when the gasoline originated in Oklahoma or Kansas, plus the actual freight charges from the place of origin to Knoxville. And the court held that the Oil Company charged an arbitrary amount for freight after June 11, 1941, and accordingly violated the terms of the contract; and that Tucker by paying for the gasoline as billed to him waived no rights against the Oil Company for such overcharges.

The Oil Company contends here, as it did in the district court, (1) that the contract is not ambiguous and (2) that even if the court's finding as to the proper method of determining the price be correct, still the judgment is erroneous because Tucker's payments were voluntary and not induced by any mistake of fact or by fraud.

■ The first contention of the parties relating to the alleged overcharge for gasoline sold to the appellee Tucker depends upon the proper construction of the supply contract, particularly upon the construction of paragraphs 5 and 8, supra. In view of the fact that we have reached the conclusion that the judgment appealed from must be reversed on other grounds it is unnecessary to discuss and decide this issue. Assuming, but not deciding, that the Oil Company overcharged Tucker within the meaning of the Supply Contract for gasoline sold and delivered between June 11, 1941, and September 1, 1944, in the amounts claimed, the payments, though made under protest, were voluntary and cannot be recovered under the pleadings and the evidence.

The facts affecting this issue are not in dispute. The Oil Company did not give Tucker the benefit of the reduced rate ordered by the Interstate Commerce Commission, but from June 11, 1941, until September 1, 1944, when the Supply Contract expired, the Oil Company charged and Tucker paid for gasoline invoiced at a price including the rail rate instead of the lower pipe line rate. Tucker testified that when he received the invoice dated June 12, 1941, he knew what the price was made up of; that he concluded in the early summer of 1942 that he had a claim for overcharges against the Oil Company. He began protesting in the fall of 1942, but, he testified "I continued to pay those gasoline bills every month right up to the expiration of the contract. I wasn't going to violate that five year contract and jeopardize my source of supply. I made no effort to bring any action to have the contract construed —I didn't file any suit against The Pure Oil Company for construction of the contract, but I made trips into the office in Chicago to attempt to settle it. About the claim I was advancing and I was uniformly advised that The Pure Oil Company did not recognize the claim as a valid one." The only action he took was to demand a credit on each month's purchases.

The court concluded as a matter of law:

"11. The defendant Tucker, by his paying for gasoline as was billed to him, and making protest thereof, did not waive a known right, nor did he intend to waive any rights against The Pure Oil Company for such overcharge."

■ This conclusion is inconsistent with the law generally and with the law of Iowa particularly. The general rule is stated in 40 Am.Jur., Payment § 157: "It is a universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal, or that there was no liability to pay in the first instance. This is true even though the payor makes the payment * * * under protest * * *"

In 48 C.J., page 734, it is said: "Except where otherwise provided by statute it is a well settled general rule that a person cannot, either by way of set-off or counter-

claim, or by direct action, recover back money which he has voluntarily paid with a full knowledge of all the facts, and without fraud, duress, or extortion, although no obligation to make such payment existed."

A voluntary payment which cannot be recovered "means a payment made by a person of his own motion, without compulsion; * * * without a mistake of fact, or fraud, duress, coercion, or extortion, on a demand which is not enforceable against the payor, instead of invoking any remedy or defense which the law affords against such demand; * * *" 48 C.J., page 736.

To constitute compulsion or coercion there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the payer or his property for which the latter has no means of immediate relief other than by making the payment. 40 Am.Jur., Payment § 162.

The law of Iowa is equally clear and explicit. In Gronstal v. Van Druff, 1935, 219 Iowa 1385, 1386, 261 N.W. 638, 640, the Supreme Court of Iowa said: "It has been the settled law of this state for over seventy years that where money is paid voluntarily, without any compulsion and without any promise to repay, it cannot be recovered by the payor." Citing Kraft v. City of Keokuk, 14 Iowa 86; Dickerman v. Lord & Smith, 21 Iowa 338, 339, 89 Am. Dec. 579; Morris v. County of Sioux, 42 Iowa 416; Murphy v. Creighton, 45 Iowa 179; City of Muscatine v. Keokuk Northern Line Packet Co., 45 Iowa 185; Baldwin v. Foss, 71 Iowa 389, 32 N.W. 389; Painter v. Polk County, 81 Iowa 242, 47 N.W. 65, 25 Am.St.Rep. 489; Weaver v. Stacey, 93 Iowa 683, 62 N.W. 22; Manning v. Poling, 114 Iowa 20, 83 N.W. 895, 86 N.W. 30; Anderson v. Cameron, 122 Iowa 183, 97 N.W. 1085.

In the Dickerman case, supra, the court, speaking through Mr. Justice Dillon, said: "To justify recovering back money paid, when all the facts were known to the party paying, such payment must not have been simply an unwilling payment, but a compulsory one, and the compulsion must have been illegal, unjust or oppressive * * If I am sued, * * * and know the

claim is unfounded, and yet pay the money, I cannot recover it back although I may, at the time of payment, have said, I paid it under protest * * * I cannot pay the amount, and by simply saying, I do so under protest, afterward re-open the question. When one pays money on an alleged claim against him, he is forever concluded from saying he did not owe it, if he paid under no mistake of fact, and if the party receiving it made use of no illegal means to coerce the payment. * * A party who has paid voluntarily under a claim of right shall not afterward recover back the money, although he protested at the time his liability."

The appellee relies upon Burlingame v. Hardin County, 180 Iowa 919, 164 N.W. 115; Carter v. Riggs, 112 Iowa 245, 83 N. W. 905; Lyman v. Lauderbaugh, 75 Iowa 481, 39 N.W. 812; Harbeck v. City of Sioux City, 199 Iowa 763, 202 N.W. 507; Standard Oil Co. v. Petroleum Products Storage Co., 163 Tenn. 565, 44 S.W.2d 317; and Ferguson v. Associated Oil Co., 173 Wash. 672, 24 P.2d 82.

These cases are not inconsistent with the Iowa cases cited above. In the Burlingame case there was a difference in opinion between the County Clerk and the County Treasurer as to the right of the clerk to retain as his own compensation paid him as referee. The clerk paid in the amount demanded with the understanding or agreement that if, in a proper proceeding, his legal right to such compensation was determined in his favor, the payment or deposit should be returned to him. This, the court held, did not bring the case within the general rule that voluntary payments of illegal demands are not recoverable by the payer. The same principle was applied by the court in Carter v. Riggs, supra, and Lyman v. Lauderbaugh, supra. Other cases cited by the appellee are not in point.

Tucker's excuse that he felt a compulsion to pay the monthly bills in order to protect his five year contract does not aid his claim. There is no evidence of any threat on the part of the Oil Company to cancel his contract. Further, he might at any time have secured an adjudication of the disputed construction of the Supply

Contract under the Federal Declaratory Judgment Act, 28 U.S.C.A. § 400.

The judgment for appellee on his counterclaim must be and it is reversed.