**RICHFIELD OIL CORPORATION, a corporation, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 15296.**

United States Court of Appeals Ninth Circuit.

Aug. 21, 1957.

David Guntert, Los Angeles, Cal., for appellant.

George Cochran Doub, Asst. Atty. Gen., Leavenworth Colby, Keith R. Ferguson, Sp. Assts. Atty. Gen., Graydon S. Staring and George Jaffin, San Francisco, Cal., Laughlin E. Waters, U. S. Atty., Los Angeles, Cal., for appellee.

Before STEPHENS, Chief Judge, and HEALY and POPE, Circuit Judges.

POPE, Circuit Judge.

Appellant filed its amended libel in the court below seeking recovery from the United States under the provisions of the Suits in Admiralty Act (46 U.S.C.A. § 741 et seq.), of a sum alleged to have been improperly exacted from the appellant and unjustly received by the United States.

The early history of the controversy between Richfield and the United States, and the circumstances out of which this suit arose, is related at some length in the earlier case of Richfield Oil Corp. v. United States, 9 Cir., 207 F.2d 864. This court affirmed the decision of the district court dismissing that former action, in part upon the ground that it was prematurely brought.

A familiarity with the facts of that case will be assumed and they will not be restated here. However, following this former decision, the parties continued negotiations for a settlement of the controversy between them. In dispute was the amount properly due Richfield under the terms of time charters of seven steamships owned by Richfield and hired by the United States during the Second World War. This depended upon which party was required to pay the cost of extra compensation and overtime owing to crew members.

On January 28, 1954, Richfield, through its general counsel, suggested to the Maritime Administration that it have its auditors compute what would be the amount of the additional charges payable by Richfield if these were calculated on the basis of Richfield paying 50% of the disputed overtime. The letter stated that upon receipt of these computations, "We will check them and in all probability make payment under protest as a preliminary step to suing for recovery; unless some satisfactory compromise settlement based upon such revised billing can be worked out."

On May 10, 1954, the district counsel for the Maritime Administration forwarded to Richfield a summary sheet showing the figures computed on the suggested 50-50 split of crew overtime, and stated that the Administration was offering to make settlement of similar disputes which it had with other companies on the basis of the assumption by the Administration of 55% thereof and the owner assuming 45%. Settlement on that basis with Richfield was proposed. Richfield in response protested that it should not be asked to make settlement on the same basis as that chosen for adjustment with other vessel owners since Richfield, alone of all such owners, had had its time charter business with the

Government renegotiated. It asked a better offer.

Then followed the final exchange of letters between the parties. On July 25, 1955, the Assistant General Counsel for the Maritime Administration wrote to Richfield advising that its counter offer could not be accepted and concluded as follows: "In view of the foregoing, we cannot make a departure in respect to your company from the common terms of settlement offered to and accepted by the other West Coast oil companies against whom the Administration has similar claims for manning watch overtime. Accordingly, unless we receive word from your company within 30 days that you are prepared to accept settlement of the manning watch overtime on the 55-45 formula agreed to by the other West Coast oil companies and to accept the other WSA charter claims of the Administration in the above mentioned total sum of $34,158.02, the Administration will have no other recourse except to institute suit or effect set-off against sums due your company from the Government, as may be appropriate."

On August 26, 1955, Richfield replied enclosing its check in the amount of $34,158.02. The introductory paragraphs of the letter were as follows: "Gentlemen: Attached hereto please find Richfield Oil Corporation check No. 37498 in the amount of $34,158.02, representing payment under protest of various items totalling $33,658.02 set forth in the attached statement prepared by your District Comptroller's Office at San Francisco, together with $500.00 claimed to be additional crew's overtime shown on records heretofore destroyed. This payment is protested on the following grounds: * * *." The letter then went on to state that the whole controversy had been previously adjusted by renegotiation which constituted an accord and satisfaction of the accounts; that it, Richfield, owed nothing to the Maritime Administration; and that under the terms of the charter the Maritime Administration was chargeable with all of the accrued overtime. This suit, to recover the amount thus paid, followed.

The amended libel sets out in general terms the history of Richfield's time charter arrangements with the United States. It alleges the proceedings renegotiating the contracts between the parties relating to these charters; the provisions of the charters relating to the extra wages and overtime; the claim made by the United States of an overpayment to Richfield in the neighborhood of $75,000, (the amount referred to in the previous litigation); the exchange of letters between the parties setting out as exhibits the last two letters above described, and makes the following allegations respecting libelant's payment of $34,158.02:

"That being convinced that respondent would summarily seize funds of libelant in the hands of other departments and agencies of respondent and/or summarily offset its claims against debts owing libelant; being informed and believing that such action by respondent would put libelant at great financial and legal disadvantage and would tarnish libelant's otherwise clean record as a supplier of petroleum products, the maintenance of which record was important to libelant; and acting under the compulsion of respondent's coercion, duress and threats, libelant, for the purpose of preventing such seizure of its property, did pay all of respondent's claims aggregating $34,158.02 under protest, as evidenced by letter dated August 26, 1955, and attachment, being pages 1, 2 and 5, respectively, of exhibit 'K' hereof.

\* \* \* \* \* \*

"That such claims collected under duress by the respondent as aforesaid had the effect of annulling, modifying and setting aside the Renegotiation Contracts and of redetermining downward the amount of profits which had been allowed li-

belant, contrary to the provisions of the Renegotiation Contracts.

\* \* \* \* \* \*

"That had such alleged indebtedness been timely asserted and paid prior to the renegotiation, the amount of alleged excessive profits eliminated thereby would have been reduced by exactly the same amount of said claim, and it follows, therefore, that the respondent had already received the amounts claimed, and the said $34,158.02 collected under duress by respondent has the effect of increasing the amount of alleged excessive profits eliminated notwithstanding that said Renegotiation Contracts provided that said contracts shall be 'a final and conclusive determination of the excessive profits.'

\* \* \* \* \* \*

"That as a direct and proximate result of the demands and duress of respondent herein and said payment under protest required thereby, respondent has been unjustly enriched under said charter parties in the amount of $34,158.02 and libelant has been damaged in the same amount."

The Government filed exceptions and exceptive allegations to this amended libel. With respect to the libel, the exceptions recited that it "shows upon its face that the said demand upon libelant by respondent in the reduced amount of $34,158.02 was based upon a compromise settlement formula referred to in the said letter as 'the 55-45 formula.'" The respondent set forth further portions of the correspondence above referred to other than the last two letters which had been attached as exhibits to the amended libel, and alleged that this additional correspondence and the exhibits set forth "show that respondent's said demand upon libelant in the reduced amount of

$34,158.02 was a compromise settlement resulting from a course of negotiation between the parties." These allegations then concluded: "Libelant, in Articles XIX and XXIV of its amended libel together with Exhibit 'K' attached thereto alleges that it paid respondent $34,158.02, the amount of respondent's reduced demand in compromise settlement, in such circumstances that such payment constituted a voluntary payment by libelant to respondent which cannot be recovered by libelant."

Richfield then filed its "Answer to Respondent's Exceptions and Exceptive Allegations to the Amended Libel". This answer set out additional portions of the correspondence had between the parties during the period of the negotiations previously referred to, and after referring to the Assistant General Counsel's letter of July 25, 1955, stated:

" \* \* \* Shortly before expiration of the thirty day period set forth in said letter from Mr. Pimper, counsel for libelant telephoned Mr. Pimper and advised that if respondent would recede from its position stated by the District Counsel, that payment under protest would not be accepted, libelant would pay the claim under protest to prevent the threatened offset and would institute suit to recover. This Mr. Pimper agreed to do, whereupon, reserving the right to sue for recovery, libelant made the payment under protest to prevent seizure of its property.

"5. Promptly thereafter and on November 30, 1955, libelant instituted suit herein to recover the payment pursuant to the reservation of right to do so as aforesaid and upon the grounds set forth in said protest."

The court below dismissed the amended libel [1] by decree as follows:

---

[1]. Appellant's statement of jurisdiction recites the appeal is under § 1291, Title 28, U.S.C., which grants jurisdiction of appeals from final decisions of the district courts. It is unnecessary to determine whether this decree dismissing the libel is a final decision under § 1291 since § 1292 confers jurisdiction of appeals from interlocutory decrees "determining the rights and liabilities of the parties to

"The above entitled matter having come on for hearing on the exceptions and exceptive allegations of the Respondent, United States of America, to the Amended Libel, on the ground that the amended libel fails to allege a cause of action within the jurisdiction of the court in that the amended libel shows that the claim of Libelant is for recovery back of a voluntary payment, * * * and the Court determining that the exceptions are well taken, and the Court having advised Proctor for Libelant that if desired Libelant might file an amended Libel, and the Proctor for Libelant advising that upon stipulation of the parties the exceptions and exceptive allegations and the answer of Libelant to the exceptions and exceptive allegations would be a part of the record on appeal that Libelant did not desire to file an Amended Libel.

"Now Therefore It Is Hereby Ordered, Adjudged and Decreed that the exceptions of Respondent to the Amended Libel be, and the same are hereby sustained, and the Amended Libel be, and the same is, hereby dismissed."

It is noted that this action was based upon the court's determination that the record showed that the payment made by Richfield of the sum which it now seeks to recover, was a voluntary one: The portions of the amended libel which we have quoted above are the only parts thereof which purport to negative the voluntary character of the payment. They allege that when Richfield was informed that other departments and agencies of the United States would summarily offset the Government's present claim against debts owing to Richfield, (presumably for petroleum products sold the Government), it believed that this would put it at great financial and legal disadvantage and would "tarnish libelant's otherwise clean record as a supplier of petroleum products." The allegation is " * * * and acting under the compulsion of respondent's coercion, duress and threats, libelant, for the purpose of preventing such seizure of its property, did pay" the $34,158.02.

 These allegations of compulsion, coercion, duress and threats must be read in the light of what the amended libel shows that the Government actually did. As disclosed by the letter of July 25, 1955, attached to the libel, the Assistant General Counsel said to Richfield that unless the latter indicated within 30 days its willingness to pay, the Government would either "institute suit or effect set-off against sums due your company from the Government." It is true that the concept of duress and compulsion has been enlarged and liberalized in the modern cases, so as to permit recovery of money improperly exacted under business or economic compulsion; but those cases are limited to instances where there is threat or danger of great property loss or heavy penalties when there seems no adequate remedy except to submit immediately and seek redress later in the court.[2] But the threatened exercise by the United States of its plain right to sue, or of its equally plain right of set-off (cf. United States v. Munsey Trust Co., 332 U.S. 234, 239, 67 S.Ct. 1599, 91 L. Ed. 2022), cannot, without more, be deemed this sort of compulsion. Whatever might be the situation of an oil company whose working capital was so

admiralty cases in which appeals from final decrees are allowed." See McLain Lines v. The Ann Marie Tracy, 2 Cir., 176 F.2d 709, 711. It would appear that the decree here met the test of finality stated in Asher v. Ruppa, 7 Cir., 173 F. 2d 10. Cf. Williams v. Peters, 9 Cir., 233 F.2d 618.

2. Thompson v. Deal, 67 App.D.C. 327, 92 F.2d 478, 484: "The old rule that there could be duress only where there was a threat of loss of life, limb, or liberty has been so changed that duress may sometimes be implied when a payment is made or an act performed to prevent great property loss or heavy penalties when there seems no adequate remedy except to submit to an unjust or illegal demand and then seek redress in the courts."

limited that such a set-off would put it out of business, there are no such facts alleged here.[3]

 In short, the allegations of compulsion, coercion and duress, are mere conclusions, and similar to those referred to in our former decision in this case (see 207 F.2d 871), and they are negatived by what the Government's letter actually said.

 The mere fact that payment was made under express protest, is not sufficient to prevent the payment from being a voluntary one which cannot be recovered back. As stated in Pure Oil Co. v. Tucker, 8 Cir., 164 F.2d 945, 947: "It is a universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal, or that there was no liability to pay in the first instance. This is true even though the payor makes the payment * * * under protest * * *."

It is to be noted, however, that in answer to the exceptive allegations of the United States Richfield claimed that before it transmitted the $34,158.02, the representatives of the negotiating parties, in a certain telephone conversation, made an oral agreement whereby the Government receded from its position not to accept payment under protest and conceded that Richfield could pay the claim under protest to prevent the threatened off-set and then institute suit to recover. It seems plain that if the parties made such an agreement, the payment of the money would not be a final accord and satisfaction, but the payment under such circumstances would be subject to Richfield's right to litigate its liability for the payment in a proper forum.

The United States asserts that the alleged oral arrangement could not under any circumstances have any force or effect here because of the parol evidence rule saying that the written terms set forth in the letter of the Government, and in effect accepted by the payment, constituted a written agreement which cannot be varied by parol evidence as to any prior or contemporaneous oral negotiations.

 Whether the parol evidence rule excludes the possibility of proof of the claimed oral negotiations, depends of course upon whether the negotiations between the parties became integrated in some writing or writings.[4] Ordinarily integration is found where a formal written contract is drawn up under such circumstances that it must be taken to have become the repository of all the prior or contemporaneous negotiations between the parties. It is possible that a letter or letters may likewise be an integration of the negotiations and agreements between contracting parties. But it is not so readily demonstrable as in the case of a formal written memorandum.[5] Whether the re-

---

3. In Cohen v. Swift & Co., 7 Cir., 95 F.2d 131, 133, it is pointed out that in such cases as Thompson v. Deal, supra, note 2, the effect of failure to comply with a Government demand would have been "financial ruin".

4. Restatement of Contracts, § 228: "What is Integration. An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted."

5. The comparative difficulty in establishing that letters, as distinguished from formal contracts, effect an integration is illustrated by the following statement in Leavitt v. Fiberloid Co., 196 Mass. 440, 82 N.E. 682, 15 L.R.A.,N.S., 855, quoted in Distillers Distributing Corp. v. Sherwood Distilling Co., 4 Cir., 180 F.2d 800, 803: "Nor is the fact that the alleged warranty was oral, while the order for and bill of parcels of the fiberloid, which caused the damage, were in writing, enough to exclude the conversation under the rule that a written contract cannot be varied by parol evidence. The letter and bill of parcels were not a formal contract of such dignity as necessarily to indicate that all previous negotiations were merged in them."

quired integration has or has not taken place is dependent upon the circumstances under which the exchange of letters was made, and upon the intention of the parties.[6] We are of the opinion that here, the facts set forth in the amended libel, in the exceptive allegations, and in the answer to the exceptive allegations, do not require a holding that the alleged parol agreement necessarily was inadmissible.

If the court, after hearing evidence, were to find that the alleged telephone conversation took place and that the actual agreement between the United States on the one hand and Richfield, on the other, was that Richfield might pay the demanded sum under protest and then proceed by suit to recover it back in order to litigate the question of its liability for any further sum, then it would be improper to hold that Richfield was barred from maintaining this action. United States v. Ohio Oil Co., 10 Cir., 163 F.2d 633, 636. In re New York O. & W. R. Co., 2 Cir., 178 F.2d 765, 766.

The Government asserts that Richfield may not here rely upon the claimed prior telephone agreement because of the defective manner in which Richfield undertook to plead that agreement. The Government says that if it was Richfield's claim that payment was made pursuant to this telephonic agreement expressly reserving the right to sue to recover the payment back, this agreement "should have been alleged in the amended libel or a further amendment filed." Attention is called to the fact, recited in the judgment, that after the court had determined that the exceptions were well taken, libelant was offered the opportunity to file an amended libel but stated it did not desire to do so. The Government says that now Richfield has no right to raise the point.

Of course the judgment recites that the reason given for the failure to amend the libel was that the parties had stipulated that the exceptions, the exceptive allegations, and the answer to the exceptions and the exceptive allegations, would be a part of the record on appeal. As we understand the Government's position, it is that a stipulation that these papers would be a part of the record on appeal did not serve to present to the trial court, in an orderly fashion for its ruling, the theory upon which Richfield now seeks to recover. The contention seems to be that Richfield's cause of action should have been set forth in a further amended libel; and that the allegations in the answer to the exceptions and exceptive allegations cannot be relied upon to supply defects in the amended libel itself.

■ If we were dealing here with a problem in common law pleading we might well find much force in the Government's argument as to the necessity for a further amendment of the libel. It might then be considered that the allegations in the answer to the exceptions and the exceptive allegations constituted what is known in pleading as a departure; that is to say, a complaint in an action at law cannot be aided by allegations in a reply which constitute a departure from the cause of action sought to be set forth in the complaint. However, this is not an *action at law;*—it is a suit in admiralty where the rules of procedure and of pleading are traditionally simple. "The rules of pleading in admiralty are exceedingly simple and free from technical requirements. * * * The proofs of each party must correspond substantially with his allegations, so as to prevent surprise. But there are no technical rules of variance, or *departure in pleading,* like those in the common law, nor is the court precluded from granting the

6. Williston on Contracts, Rev.Ed. § 633: "The parol evidence rule does not apply to every contract of which there is written evidence, but 'only applies where the parties to an agreement reduce it to writing, and agree or intend that that writing shall be their agreement' * *.

Frequently, it is not a necessary inference from the writing itself either that it is a statement of the whole agreement, or that it is not. In such a case it has been held that parol evidence is admissible to show which is the fact." Cf. Wigmore, Evidence, 3d Ed., §§ 2429, 2430.

relief appropriate to the case appearing on the record, and prayed for by the libel, because that entire case is not technically stated in the libel." (Emphasis supplied.) Dupont de Nemours & Co. v. Vance, 19 How. 162, 171, 172, 15 L.Ed. 584. Accord: Archawski v. Hanioti, 350 U.S. 532, 534, 76 S.Ct. 617, 100 L.Ed. 676. These cases were cited and followed in Orion Shipping & Trading Co. v. United States, 9 Cir., 247 F.2d 755.

■■■ The use of the exceptive allegations in connection with exceptions to a pleading in admiralty is itself an illustration of the liberal informality permitted in admiralty. See Suspine v. Compania Transatlantica Centroamericana, D.C.S.D.N.Y., 37 F.Supp. 263. We are of the opinion that in view of the traditionally simple rules of procedure in admiralty exceptive allegations, when properly denied, or otherwise explained or avoided by answer, as here, should not be the basis of summary action. Cf. North American Smelting Co. v. Moller, D.C.E.D.Pa., 95 F.Supp. 71. We would disregard the technical argument that Richfield's allegations of the telephonic agreement should have been included in the amended libel. The contention that the insertion of these allegations in the answer to the exceptions and exceptive allegations amounted to a departure is an attempt to apply technical rules that admiralty disregards. It was apparent that Richfield was attempting to plead the alleged telephone agreement and that therefore an issue of fact was presented. We hold therefore that it was error summarily to dismiss the libel.[7]

In our view the case presents an issue of fact with respect to whether the agreement alleged to have been made by telephone was or was not made, providing, of course, the court does not find upon the evidence that the letters between the parties constituted an integration of their prior or contemporaneous negotiations so as to require exclusion of any evidence of oral negotiations.

The judgment of the district court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

7. If the trial court's offer to allow an amendment of the libel meant that it considered it necessary that the oral agreement set forth in the answer to the exceptive allegations be alleged in the libel, it would seem that libelant would have been well advised to make that amendment. Instead it announced it would not amend in view of the stipulation that the exceptions and exceptive allegations and the answer thereto would be a part of the record on appeal. Libelant may have assumed that the appeal would vacate the decree below and constitute a trial *de novo*, on which we could consider the whole record.

Since McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, it is not clear what, if anything remains of the notion of a trial de novo as that term is described in such cases as Untersinger v. United States, 2 Cir., 181 F.2d 953, 956, and Petterson v. Alaska S.S. Co., 9 Cir., 205 F.2d 478, 479. The holding of McAllister with respect to review of findings based on evidence, was long forecast in the leading case of Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992. Here, of course, only the pleadings and their meanings are involved on this appeal. Our authority to permit amendments of libels on appeal, Suren v. Oceanic S.S. Co., 9 Cir., 85 F.2d 324, 325, and on appeal to take proofs, Rule 45, Admiralty Rules, 28 U.S.C. may indicate that there is yet some vestige of an authority to treat records on appeal in admiralty de novo. But this we need not pass upon here in view of our holding that the trial court should not have granted a dismissal on the record before it.