**AMERICAN METAL COMPANY, Ltd., et al., Plaintiffs,**

v.

**M/V BELLEVILLE et al., Defendants, and Three Consolidated Causes.**

**Ad. 192–296, 196–3, 195–356 and 194–16.**

United States District Court
S. D. New York.

May 7, 1968.

The suit against the master has been discontinued. In the other three actions, the claimants seek recovery from the shipowner for cargo damage caused by the stranding, from the shipowner and the salvor jointly for additional damage allegedly caused by negligence in the salvage operation, and from the salvor alone for salvage charges already paid by cargo under protest. The claims for damages total $294,263.27 and include the following items: nondelivery, delivery in damaged condition, short delivery, on-carriage expenses, salvage and general charges.

## I. *The Stranding*

█ Under the Carriage of Goods by Sea Act, 46 U.S.C. § 1304, and general maritime law principles, a shipowner is not liable for damage to cargo caused by error or neglect in navigation. Cargo claimants may recover only if there was an unreasonable deviation from the ship's contemplated voyage or some unseaworthy condition, which was a proximate cause of the damage.

Hill, Rivkins, Warburton, McGowan & Carey, of New York City, for plaintiffs; Allan B. Lutz and Vincent J. Ryan, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendants Skibs A/S Solstad and Merritt-Chapman & Scott Corp.; Gordon W. Paulsen and Richard G. Ashworth, New York City, of counsel.

METZNER, District Judge.

These are four consolidated actions arising from the stranding of the motor vessel Belleville off Newport, Rhode Island on September 24, 1957. In the action numbered Ad. 192–296, certain cargo interests (hereinafter called "cargo claimants") brought suit against the vessel and her owner for cargo damage. The shipowner filed a limitation of liability petition, Ad. 194–16, in which the salvor has been impleaded. The cargo claimants also filed separate suits against the salvor, Ad. 195–356, and against the master of the Belleville at the time of the stranding, Ad. 196–3.

The Belleville was a general cargo vessel owned by Skibs A/S Solstad and was of Norwegian registry. It was operated by the Barber-Fern-Ville Lines, for whom A. F. Klaveness & Co. were the managers and Barber Steamship Lines, Inc. the general agents in the United States. The vessel had picked up cargo in the Far East for discharge at Atlantic and Gulf ports in the United States. The vessel was grounded on Seal Rock at Brenton Reef, outside Narragansett Bay, and broke up.

The particular portion of the voyage with which we are concerned covers New York to Boston to Philadelphia. Part of the vessel's cargo was discharged at New York. Pilot Staalesen was taken on in New York. For years he had been employed by Klaveness to handle its vessels on this portion of the voyage. The Belleville took an open sea course up to Block Island, where the pilot took over to go through Buzzards Bay and the Cape Cod Canal to Boston. At Boston additional cargo was discharged. At the

time of leaving Boston, Staalesen was asked to return to Boston after taking the Belleville through the Cape Cod Canal in order to take another Klaveness vessel, the Corneville, down through the canal the next day. He arranged with the master of the Belleville to let him off at the pilot station off Brenton Reef Lightship outside Narragansett Bay. The pilot station was the waters between the lightship and the entrance to Narragansett Bay, where pilot boats picked up and delivered pilots to vessels. This arrangement allowed Staalesen to return to Boston by way of Newport instead of staying on the vessel all the way to Philadelphia. The vessel came down from Boston through the Cape Cod Canal and Buzzards Bay, but instead of continuing outside Block Island into the ocean, it went some 10–15 miles off that course to drop the pilot. As it approached the area of the pilot station at 5:22 AM on September 24, 1957, it was grounded. But for this unhappy accident, about an hour of time would have been lost on the trip to Philadelphia.

In all the years that Staalesen had been a pilot for Klaveness, this was the first time he had been let off a vessel at Brenton Reef after coming through Buzzards Bay, instead of proceeding directly past Block Island. His fee was $125 to take the vessel from Boston through the canal and an additional $25 to continue down to Philadelphia on the open sea course. When the vessel arrived at the Delaware River, a state-licensed pilot would have had to be taken on to navigate the vessel up to Philadelphia. Consequently, there was no need for Staalesen to stay on the vessel. On the other hand, Staalesen could have secured another pilot for the Corneville, but would have lost the extra income.

The pilot station was an established point where vessels could drop pilots after coming down from Boston through the Cape Cod Canal. There was no other place to do this east of Brenton Reef.

The course from Buzzards Bay to the pilot station was laid out by Staalesen and the master. At 4:25 AM the Belleville passed the Buzzards Lightvessel and proceeded toward the Brenton Reef Lightvessel, whose light, as well as that of Beavertail Point, was visible. The vessel was on a westerly course and should have been navigated with the light on Seal Ledge Buoy to starboard, the light on Brenton Reef to port and the bow of the vessel pointing toward Beavertail. However, no one on the vessel saw the Seal Ledge Light and the vessel came inside that light and pointed toward Beavertail, which mistakenly had been pointed out to the master as Brenton Reef Light. While the master was checking on this information, the vessel stranded on Seal Rock, which is about a mile from where it was to meet the pilot boat.

As the Belleville came down from Buzzards Bay toward the pilot station, the chief mate and two unlicensed men were on duty. At 5:00 AM the chief mate ordered one of the unlicensed men to rig a ladder in order to disembark the pilot. The other unlicensed man was at the wheel. There was thus no bow lookout at the time. Such a lookout would have reported the presence of lights and any objects in the course of the vessel. Under the good weather conditions existing in the early morning of September 24, the Seal Ledge Buoy Light could be seen for about 4 miles. The Belleville was operating with a 1950 issue chart with corrections entered in pencil or ink to bring it up to date. The corrections did not indicate that the light at Sakonnet Point was out of working order, but this had no effect on the issues in this action.

█ The above recitation of the facts brings us to the first issue in these cases. Did the Belleville deviate from its course when it proceeded to the Narragansett Pilot Station to drop Staalesen, and if so, was such a deviation reasonable?

As noted above, the cargo from the Far East was destined for Atlantic and Gulf ports in the United States. The bill of lading contained the type of broad "liberty" clause discussed in American Cyanamid Co. v. Booth S.S.

Co., 99 F.Supp. 232 (S.D.N.Y.1951), aff'd on opinion below sub nom. Feuer v. Booth S.S. Co., 195 F.2d 529 (2d Cir. 1952); Haroco Co. v. The Tai Shan, 111 F.Supp. 638 (S.D.N.Y.1953), aff'd on opinion below sub nom. Frederick H. Cone & Co. v. The Tai Shan, 218 F.2d 822 (2d Cir. 1955). As these cases indicate, such a clause must be trimmed down to what must have been fairly agreed upon by the parties as to the voyage of the vessel. A deviation is a departure from this agreement. No one is complaining, as well they could not under the liberty clause, that taking the vessel from New York up to Boston and back down past New York to Philadelphia was a deviation. The complaint is directed to the detour to Brenton Reef on the Boston-Philadelphia leg of the journey. The presence of the pilot on the Belleville after coming through Buzzards Bay was of no advantage to the ship since he would not aid navigation down to the Delaware River, at which point a Pennsylvania-licensed pilot would have had to take over to take the Belleville up to Philadelphia. Even though the Belleville normally carried its pilot to Philadelphia, I cannot conceive that such procedure was within the contemplation of the parties when the bill of lading was issued, so as to prevent the vessel from dropping its pilot at the first available station after his services had been completed. This is especially true since the Narragansett Pilot Station was utilized by other ships for that very purpose. Under the circumstances, this must be considered the normal route between both ports. The only way the stop at the pilot station could have been avoided would have been to use a Cape Cod pilot who lived on the Cape and owned his own pilot boat. The vessel was not compelled to make such a choice. The intended dropping of the pilot at the Narragansett Pilot Station was not a deviation from the voyage contracted for.

Even if a deviation could be found under the facts of this case, it certainly would not be an unreasonable one so as to violate the statutory limitations in the Carriage of Goods by Sea Act in 46 U.S.C. § 1304(4). As Judge Dimock pointed out in the *Haroco* case, supra, the presence of the liberty clause may be considered as bearing on the reasonableness of the deviation even though the clause does not prevent the finding of such deviation.

■ Since there was no deviation in breach of the provisions of the contract of carriage or of COGSA, liability for what occurred cannot be attached to the carrier unless the loss arose from unseaworthiness caused by want of due diligence on the part of the owner. 46 U.S.C. § 1304(1). Such is not the case here.

The crew was competent to manage the vessel. The damage resulted from an act, neglect or default of the master and/or the pilot and therefore the owner is not liable. 46 U.S.C. § 1304(2). The master is charged with the responsibility of having proper charts. Assuming that the charts had not been corrected as claimed by plaintiffs, the failure to show several buoys and the showing of a light no longer in existence on the original issue of the chart did not contribute to the grounding. See The Temple Bar, 137 F.2d 293 (4th Cir. 1943).

The direction to have a man who was available as a lookout rig the pilot ladder was at most a negligent act on the part of the chief mate. Furthermore, in view of the visibility present at the time and the power of the lights then in operation as aids to navigation, the failure to have such a lookout was not a proximate cause of the grounding.

Since I have found neither unreasonable deviation nor unseaworthiness, cargo claimants may not recover for loss or damage which resulted from the stranding.

## II. *The Salvage Operation*

The claims of cargo arising out of the salvage operations which followed the stranding fall into two categories. First, claimants seek to recover salvage charges already paid to Merritt-Chapman & Scott, the salvor. Second, they seek compensa-

tion for physical damage to cargo which they claim resulted from negligence during the salvage operations.

When the New York representative of the owner of the Belleville was notified of the stranding, it conferred with the hull underwriters and they notified Merritt-Chapman & Scott. The latter dispatched its salvage tug, the Curb, from New York to go to the assistance of the Belleville. The Curb arrived alongside the Belleville in the evening of September 24. During the course of that day, the master of the Belleville first notified the owners that he recommended discharging all cargo. Several hours later at low tide, he informed the owners that there was no danger of capsizing and then came to the conclusion that there was no danger if the weather did not change. He asked for advice as to whether he should sign Lloyd's standard form of no cure-no pay salvage contract. He radioed the master of the Curb that he would accept the form of contract if the owners and hull underwriters agreed. This approval was received the following day and the contract was signed. No request was ever made of cargo interests as to whether the contract should be signed. This fact is important, since the contract contained arbitration clauses and provided that the master signs as agent for the "vessel, her cargo and freight and the respective owners thereof and binds each to the due performance thereof."

The salvage operations started on September 25 and continued until November 18, when they were abandoned. A great deal of cargo was salved and made subject to the general average, salvage charges and extraordinary expenses. The cargo interests received notice of arbitration, but the present claimants did not participate in the arbitration. An award was made in favor of the salvor which was modified on appeal and the cargo claimants have paid their share of the award under protest.

 Cargo claimants assert that they cannot be bound by the salvage contract, and more particularly by the arbitration clauses in that contract. After reviewing the text writers, Carver, Carriage of Goods by Sea 507 et seq. (10th ed. 1957); Norris, The Law of Salvage § 178 (1958); Kennedy, Civil Salvage 329 (4th ed. 1958), and the authorities cited therein, I have come to the conclusion that this contention should be upheld. In case of emergencies, the master has the authority to bind cargo under the concept of agent by necessity. The Alert, 56 F. 721 (S.D. N.Y.1893). However, the agency does not arise if the master acted pursuant to superior authority, see Gillespie v. Burns (1946) 79 Ll. L.R. 393 (N.S.W.), or if he had the opportunity to communicate with the cargo owners before taking action. See Carver, supra at 508. Both of these circumstances arose in this case. The master first notified the owners and their agents of the plight of the Belleville at about 7:30 AM on September 24. He did not sign the salvage contract until 2:00 PM on September 25 after he had received instructions to that effect from the owners in Norway. Thus he acted solely on the directions of his superiors and not on his own authority. Secondly, the time that elapsed before the instructions were received to sign the salvage contract afforded ample opportunity for the owner's agents in New York to contact the cargo interests for instructions. Cargo therefore was not bound by the salvage contract and the arbitration award.

 Nevertheless, the payment under protest by the cargo interests of their respective shares of the arbitration award precludes any attack on the reasonableness of the assessment of salvage charges due the salvor. It is a universally recognized rule that money voluntarily paid under a claim of right, and with knowledge of the facts by the payor, cannot be recovered back on the ground that the claim was illegal or that there was no liability to pay in the first instance. The payment here was voluntary and the assertion that it was made under protest does not change its voluntary character. See Richfield Oil Corp. v.

United States, 248 F.2d 217 (9th Cir. 1957); Pure Oil Co. v. Tucker, 164 F.2d 945 (8th Cir. 1947); Putnam Tool Co. v. United States, 147 F.Supp. 746, 137 Ct.Cl. 183 (1957), cert. denied, 355 U.S. 825, 78 S.Ct. 33, 2 L.Ed.2d 39 (1957); The Glittre v. Dill, 152 F.Supp. 934 (S.D.N.Y.1957).

█ The voluntary payment covered the salvage services rendered by Merritt-Chapman & Scott. It does not preclude the cargo claimants from claiming physical damage due to the negligence of the Salvor. It is true that such claims could have been asserted in the arbitration proceedings as setoffs. But, since the contract was not binding on cargo claimants, they are free to assert these claims in this proceeding. Furthermore, the fact that the salvage charges were voluntarily paid in full without setting off the claims for cargo damage does not preclude assertion of such claims, since failure to withhold a claimed setoff from a voluntary payment does not constitute voluntary relinquishment thereof. The doctrine of voluntary payment applies only to payments, not to setoffs. United States v. Eastport S.S. Corp., 255 F.2d 795 (2d Cir. 1958).

Coming now to the claims of the various cargo interests in the order in which they were presented on the trial, I find that the 580 chests of tea were stowed in the deep tanks which were flooded on the stranding and as a result the tea was not fit for human consumption. S. J. Pike and Co., Inc. and Lee Tire and Rubber Corporation each are claimants for 448 bales of rubber. They were stowed in the #2 and #3 holds and were also damaged at the time of the stranding. 425 of the total of 996 bales were delivered, but no survey testimony has been adduced as to them. The balance of this cargo was trapped in the hold and could not be discharged. The 202 cases of tea claimed by Thomas J. Lipton were stowed in the deep tanks, which were flooded as a result of the stranding, and were valueless. No proof has been offered on the extent of damage to the case of personal effects or where it was stowed. One carton was landed and delivered and the other was landed, but not claimed.

There is a claim relative to 140 bags of black pepper. This was stowed in the reefer compartment of the #3 lower 'tween deck. The compartment was partially flooded with sea water and oil as a result of the stranding. This accounts for the nondelivery of 77 bags. The balance of 63 bags was delivered in good condition and no proof has been offered of any damage resulting from the salvage operation.

The next claim is for 1100 bales of rubber for which the claimant is Little John & Co., Inc. Testimony was offered by claimant on this claim. The rubber was stowed in #5 hold, which was dry throughout the operations, and the rubber was dry when discharged. On delivery 4 bales were found to be soaked from submersion in salt water. 318 bales had fresh-water stains on one side. They were delivered from the Belleville to a closed pier in Providence. There is no explanation as to how the bales were so stained and claimant's expert testified that the stains could have pre-existed shipment. I find that the damage to the 318 bales was not connected with the stranding or the salvage operations. As to the 4 bales, their value was a total of about $16 and the damage was not due to any negligence on the part of the salvor, in view of the conditions under which they were discharged.

There is a claim for 106 bales of rubber for which the claimant is Avia Co. All bales were delivered and at the time 68 were in good condition, 23 had old, dry fresh-water stains which were not attributable to the stranding or salvage operation, and 15 were slightly stained with salt water, causing damage in the sum of $18.75. This damage was not due to any negligence on the part of the salvor.

The next claim involves 751 bags of coffee. These bags were all delivered except that 15 of them were recoopered because of tearing and resulting slack and 10 of them had evidence of salt-

water damage. As far as the court can determine, this coffee was in the #2 shelter 'tween deck and was discharged dry from the vessel before October 1. Any damage that may have resulted did not occur because of any negligence on the part of the salvor.

B. F. Goodrich is a claimant for 431 bales of rubber. 428 were delivered. 2 were not delivered and 1 was badly damaged for a total damage of $180.93. 120 bales had drip stains, causing a damage of $78. There is no proof as to where this cargo was stowed. As far as the court can ascertain, none of this damage is attributable to the negligence of the salvor.

The claimant for 1138 tons of tin suffered no loss attributable to physical damage or nondelivery.

The libels and petition are dismissed.

This opinion shall constitute the court's findings of fact and conclusions of law.

Settle judgments in accordance with the above opinion which is applicable to the four cases that were tried together.