**BUCK KREIHS COMPANY, Inc.,**
Plaintiff,

v.

**UNITED STATES of America and Mississippi Valley Electric Co., Inc.,**
Defendants.

**Civ. A. No. 70–1573.**

United States District Court,
E. D. Louisiana, New Orleans Division.

Sept. 9, 1971.

Peter J. Butler, Jr., New Orleans, La., for plaintiff.

Kieron F. Quinn, Washington, D. C., John R. Schupp, Asst. U. S. Atty., New Orleans, La., for defendant, United States of America.

Jerry C. Paradis, Conrad Meyer, IV, New Orleans, La., for defendant, Mississippi Valley Electric Co., Inc.

ALVIN B. RUBIN, District Judge:

Kreihs contracted with the United States on July 30, 1965, to recondition vessels in the New Orleans area. Article 41 of the contract imposed a ten per cent profit limitation. Pursuant to this contract, eight job orders were issued in 1966, and the work done in that year amounted to $1,871,826.50. Thereafter the United States through the Maritime Administration, audited Kreihs' books and billed it for $54,437.96, an amount determined to be the amount of profits realized by Kreihs in 1966 in excess of 10% of the contract price on these job orders. The Maritime Administration agreed to accept $45,717.01, pending resolution of a dispute concerning depreciation (which is not here involved). Kreihs seeks refund of this sum. It concedes that this sum is the correct amount due the government under Section 41 of the contract, but contends that the Section was not validly incorporated into the agreement.

I. The Nature of the Plaintiff's Payment

■ The United States contends that the plaintiff's voluntary payment of the amount demanded precludes a suit for refund. Generally, "money voluntarily paid under a claim of right, and with knowledge of the facts by the payor, cannot be recovered back on the ground

that * * * there was no liability to pay in the first instance." American Metal Co. v. M/V Belleville, S.D.N.Y. 1968, 284 F.Supp. 1002. However, it is equally well recognized that the payment is involuntary if failure to pay will lead the government to take steps that are likely to cause the financial ruin of the debtor, Richfield Oil Corp. v. United States, 9 Cir. 1957, 248 F.2d 217.

■ While there is some dispute about the exact circumstances surrounding the payment, I find that, when the U. S. made its claim, plaintiff's president protested vigorously. The protests culminated in a conference with Mr. Schumm, a government contracting officer. At this conference, Mr. Schumm stated that Kreihs would be placed on the government-wide debt list if it failed to pay. In addition, Mr. Schumm wrote Kreihs to that effect. The purpose of this threat was to coerce Kreihs to pay; it had that result. The company paid, protesting all the while, asking that its funds be put in escrow, and stating that it intended to file suit immediately to recover, as it in fact did.

Kreihs related that Mr. Schumm further informed him that the list was circulated to all government agencies, and that, if the company were listed, it would receive no more government work. He testified that his company could not survive without such work. The evidence does not support this interpretation of the effect of a listing; apparently the sole result would have been to enable other government agencies to withhold money due Kreihs. But, knowing nothing of the inner workings of the Maritime Administration, Kreihs was justifiably apprehensive that the listing was a threat to his business welfare, and would have greater impact than merely the collection of funds claimed. Indeed, it is difficult to understand Mr. Schumm's insistence if he did not intend to create apprehension, for a simple inquiry would have ascertained that the funds could readily have been collected by off-set.

Accordingly, I find that, as in the Richfield Oil Corporation case, *supra,* there was an understanding "between the United States on the one hand and [Buck Kreihs], on the other, * * * that [Buck Kreihs] might pay the demanded sum under protest and then proceed by suit to recover it back in order to litigate the question of its liability. * * * *" See Richfield Oil Corp. v. United States, 9 Cir. 1957, 248 F.2d 217, 224. It would, therefore, be improper to bar Buck Kreihs from maintaining this action.

II. The Renegotiation Act and the Contractual Profit Limitation

A preliminary issue may be easily disposed of. One article of the original master contract (Article 34) incorporated the profit limitation procedure of the Renegotiation Act by reference. The defendant has contended that this article was deleted by pen and ink prior to the execution of the contract with the request that a different profit limitation procedure was substituted. Kreihs argues that Article 34 was not eliminated and that two profit limitation procedures are provided for in the contract. It appears that the document was executed in multiple originals that differ in this regard: in one the paragraph is deleted, in the other it is not. Hence, each party has produced a copy of the contract that supports its position.

But we need not attempt to determine which copy reflects the intention of the parties. Both parties concede that the Renegotiation Act is applicable to contracts of the type involved here. Since Section 104 of that act, 50 U.S.C. App. § 1214, requires inclusion of a renegotiation clause in contracts of this kind, it is of little consequence whether the clause was physically left in the document or deleted from it. The only issue is whether in contracts of this type renegotiation is the exclusive profit limitation procedure, or whether the parties may contract for an alternative procedure. The search for an answer to this simple question leads into a statutory maze constructed by a legislative Daedalus.

Under the Renegotiation Act excess profits are determined on the basis of receipts, accruals and costs from all applicable contracts performed during the fiscal year. 50 U.S.C. App. § 1213(e). Article 41 of the master contract involved in this dispute proves for a ten per cent maximum profit and operates on a contract-by-contract basis. The plaintiff argues that the Renegotiation Act, where applicable, provides the exclusive method of profit limitation, and that contractual agreements to the contrary are invalid.

The statutory scheme negates this contention. The Act is made applicable to all contracts with certain government departments performed after a certain date. 50 U.S.C. App. § 1212(a). The Maritime Administration, MARAD, with whom Kreihs contracted, is one such department, 50 U.S.C. App. § 1213(a). The Board is permitted to *exempt* from the renegotiation procedure "any contract * * * if, in the opinion of the Board, the provisions of the contract are otherwise adequate to prevent excessive profits. * * *" 50 U.S.C. App. § 1216(d) (3).

Section 1216(d) (3) assumes that a government contract may contain provisions adequate to prevent excessive profits other than renegotiation requirements. This clearly indicates that the contracting authority may bargain for some other kind of profit limitation. See Newport News Shipbuilding and Dry Dock Co. v. United States, 1967, 179 Ct.Cl. 97, 374 F.2d 516, 526–527.

This interpretation is buttressed by statutory language that intimates that on *some* occasions a contractual provision cannot supplant the renegotiation procedure. Section 1212(e) provides in part, "notwithstanding any agreement to the contrary, the profit-limitation provisions * * * of section 505(b) Merchant Marine Act, 1936, * * * shall not apply * * * to

any contract or subcontract entered into after December 31, 1950 if any of the receipts or accruals therefrom are subject to this title." Section 505(b) of the Merchant Marine Act contains a type of profit limitation procedure different from renegotiation and based on a 10% profit limitation. It is similar in terms to Article 41 of the contract with Kreihs.

Thus, Section 1212(e) prevents parties from incorporating section 505(b) by reference into applicable contracts. It implies a prohibition of any contractual provision similar in terms to section 505(b) [i. e. any contractual provision like Section 41] in any contract normally governed by section 505(b). A less restrictive approach would permit too easy avoidance of section 1212(e).

But evidently Congress did not intend to forbid ten per cent profit limitations in *all* ship contracts, for it did not attempt to write any such sweeping prohibition. Thus, the Renegotiation Act's preclusion of agreements similar to section 505(b) should apply only to those ship contracts otherwise governed by that section of the 1936 Marine Act.

■ Section 505(b), 46 U.S.C. § 1155(b), governs two types of contracts. By its own terms, it limits profits on ship construction contracts. In addition, 46 U.S.C. § 1193 makes it applicable to ship reconditioning contracts entered into under subchapter VII of the 1936 Marine Act. Though Kreihs contracted to recondition several vessels, the contract was not let under subchapter VII. Hence the ten per cent profit limitation of section 505(b) did not apply to this contract, and the Renegotiation Act does not forbid the inclusion of a *contractual* ten per cent profit ceiling.

The reconditioning contract in dispute was executed under the authority of the Merchant Ship Sales Act of 1946 and subchapter IX of the 1936 Marine Act. The Ship Sales Act provides for the orderly disposition of the huge fleet of cargo vessels built and operated by the United States during World War II. Section 50 U.S.C. App. § 1744(a) established the National Defense Reserve Fleet (the so-called mothball fleet). The pertinent provision of that section provides that any government-owned vessel may be used for the account of any agency or department of the United States during a presidentially declared period of national emergency as defined in Section 902 of the 1936 Marine Act, 46 U.S.C. § 1242. Such a proclamation was made on December 16, 1950 (15 F. R. 9029) and has never been terminated. The Maritime Administration of the Department of Commerce manages and maintains the National Defense Reserve Fleet.

Ocean transportation responsibility for all elements of the military has been given to the Military Sealift Command (MSC) (formerly MSTS, the Military Sea Transportation Service), a flag command of the U. S. Navy. The duties and responsibilities of this command are set out in 32 C.F.R. Chapter 1, Part 174. 32 C.F.R. 174.1(e) provides, in pertinent part:

The primary mission of MSTS is to provide immediate sealift capacity in an emergency. MSTS operates government-owned ships and augments this capability by shipping cargo and passengers in commercially operated ships, chartering ships, *and exercising operational control over ships activated from the National Defense Reserve Fleet to meet emergency needs.* (Emphasis added.)

32 C.F.R. 174.3(e) provides in part:

Merchant ships activated from the National Defense Reserve Fleet to meet emergency needs are placed under MSTS operational control by means of U. S. Maritime Administration General Agency Agreements.

An agreement between MSTS and MARAD provides for a written request, subsequent reactivation of the vessels by

MARAD and reimbursement of costs by MSTS. In the case of the ships involved in this dispute, the pertinent requests for reactivation designation of vessels and designation of general agents were made. The SS RUTGERS VICTORY will be used as an example. On December 9, 1965, MSTS wrote MARAD requesting that twenty-five victory ships be reactivated to carry MSTS cargo. MARAD replied, on December 16, 1965, that the agency was complying with the request and that the ships had been assigned to General Agents.

46 U.S.C. § 1242, which defines a period of national emergency, also provides for the repairing or reconditioning of any vessels utilized during the emergency, 46 U.S.C. § 1242(e). Since this section is a part of subchapter IX of the 1936 Marine Act, section 505(b), 46 U.S.C. § 1155(b), is not applicable and the Renegotiation Act does not preclude a contractual ten per cent profit limitation.

Validating the ten per cent contractual limitation does not, of course, do away with the renegotiations procedure mandated by law. Under 50 U.S.C. App. § 1216(d) (3), the Renegotiation Board may exempt the contract in dispute from renegotiation if it finds that the ten per cent limitation adequately prevents excessive profits. Alternatively the renegotiation procedure might be utilized to recapture any excess profits that exist in all of the Kreihs' contracts, after the ten per cent limitation provision has been utilized in this contract, unless, of course, it was the parties' intention to delete it from the contract and this deletion meets the requirements of law. That issue is not now before us. But if there was some inconsistency between the two profit limitation procedures, it was foreseeable when Kreihs contracted to recondition the vessels.

For the reasons given above, the plaintiff's suit for refund will be dismissed.