**BUCK KREIHS COMPANY, Incorporated, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 72–1184

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

June 21, 1972.

Peter J. Butler, New Orleans, La., for plaintiff-appellant.

Kieron F. Quinn, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Walter H. Fleischer, Robert M. Feinson, Dept. of Justice, Washington, D. C., L. Patrick Gray, III, Asst. Atty. Gen., for the United States.

Jerry C. Paradis, Conrad Meyer, IV, New Orleans, La., for Miss. Valley Elec. Co., Inc.

Before THORNBERRY, COLEMAN and INGRAHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

■ This appeal follows the district court's determination, 331 F.Supp. 1173, that the Renegotiation Act of 1951, 50 App. U.S.C.A. § 1211 et seq. (the Act), does not preclude the Federal Maritime Administration from including a ten percent profit limitation clause in its master repair contracts. Finding support for this judgment in reason, the statutes, and the legislative history of the Act, we affirm.

On July 30, 1965, Buck Kreihs Company, Incorporated (Kreihs) entered into a

---

* Rule 18, 5th Cir.; *see* Isbell Enterprises, Inc. v. Citizens Casualty Company of

New York et al., 5th Cir. 1970, 431 F.2d 409, Part I.

Master Lump Sum Repair Contract with the Federal Maritime Administration to recondition vessels in the New Orleans area. Pursuant to the contract, eight job orders were issued to Kreihs in 1966 for which it was paid $1,871,826.50. Following an audit of its books, Kreihs was forced to pay the government $45,717.01 as excessive profit pursuant to Article 41 of the contract.[1] Kreihs thereafter commenced the instant action to recover this sum.

Both Kreihs and the government agree that the contract is subject to the Renegotiation Act of 1951,[2] the purpose of which is to eliminate excess profits earned under government contracts subject to its provisions. Article 41 of the contract, however, provided further that:

(a) In the event any work is awarded subject to the provisions of this Article, the Contractor agrees that as to [each] job order covering such work, . . . :

(ii) To pay to the Administration profit, as shall be determined by the Administration, in excess of 10 per cent of the total contract price or said modified contract price, covering work subject to the provisions of this Article or work under subcontracts for work subject to provisions substantially the same as set out in this Article under other lump sum ship repair contracts of the Administration, as is completed by the Contractor within the income taxable year, which such amount or amounts shall become the sole property of the United States; provided, however, that if there is a net loss on all such work or subcontract work such net loss shall be allowed as a credit in determining the excess profit, if any, for the next succeeding income taxable year provided, that if such amount is not voluntarily paid, the Administration shall determine the amount of such excess profit and collect it in the same manner that other debts due the United States may be collected.

The differences between the two methods of computing excess profits derived from the Act on the one hand and from Article 41 on the other produces the controversy involved here. The Act operates on an overall fiscal year basis with respect to all work performed under a contract, regardless of its state of completion. See 50 App. U.S.C.A. § 1213(f).[3] By determining profits in

1. Although the government contended in the court below that Kreihs had voluntarily paid these sums, the district court found as a matter of fact that Kreihs had paid only under protest and under the government's threat to place the company on its debt list. The government erroneously represented to Kreihs that such action would result in the company's inability to receive further government contracts. This finding is not disputed here.

2. Section 104 of the Act, 50 App.U.S.C.A. § 1214, provides that the Act is to be applied even if its provisions for the elimination of excess profits are not specifically included in the contract. Moreover, Article 34 of the contract here involved provided:

   This contract shall be deemed to contain all the provisions required by § 104 of the Renegotiation Act of 1951. The Contractor shall, in compliance with said § 104, insert the provisions of this Article in each subcontract and purchase order made or issued in carrying out this contract.

3. This section provides, in pertinent part:
   *Profits derived from contracts with the departments and subcontracts*
   (f) The term "profits derived from contracts with the Departments and subcontracts" means the excess of the amount received or accrued under such contracts and subcontracts over the costs paid or incurred with respect thereto and determined to be allocable thereto. All items estimated to be allowed as deductions and exclusions under chapter 1 of the Internal Revenue Code (excluding taxes measured by income) shall, to the extent allocable to such contracts, and subcontracts, be allowed as items of cost, except that no amount shall be allowed as an item of cost by reason of the application of a carry-over or carry-back. Notwithstanding any other provision of this section, there shall be allowed as an item of cost in any fiscal year . . . ., subject to regulations of the Board, an amount equal to the excess, if any, of costs (computed without the application of this sentence)

this manner, the reviewing authority must consider all of the actual work performed by the contractor during its fiscal year, which necessitates consideration of unprofitable as well as profitable jobs. The profit limitations of Article 41, however, apply separately with respect to each *completed* job performed under a contract, independent of any time element. Under this system of computation, of course, the unprofitableness of any other jobs or work performed cannot be considered.[4]

■ Although the two methods are different without question, we fail to find support for Kreihs' assertion here that they are irreconcilable when applied to the instant contract and that they represent an attempt by the government to substitute the profit determination provisions of Article 41 for those of the Act. There is nothing irreconcilable about the Maritime Administration's attempting to avoid payments to contractors which result in his reaping excessive profits and the Act's aim of recapturing at the end of the fiscal year excess profits nevertheless realized. There has been no substitution of Article 41 for the Act; Kreihs must conform to the requirements of both. *See* Newport News Shipbuilding and Dry Dock Company v. United States, 1967, 374 F.2d 516, 527–528, 179 Ct.Cl. 97.

■ Kreihs argues that the Renegotiation Act prohibits *all* attempts by the government to prevent excess profits by supplemental means. We disagree. The purpose of the Act is stated as follows:

It is recognized and declared that the Congress has made available for the execution of the national defense program extensive funds, by appropriation and otherwise, for the procurement of property, processes, and services, and the construction of facilities necessary for the national defense; that sound execution of the national defense program requires the elimination of excessive profits from contracts made with the United States, and from related subcontracts, in the course of said program; and that the considered policy of the Congress, in the interests of the national defense and the general welfare of the Nation, requires that such excessive profits be eliminated as provided in this title.

50 App. U.S.C.A. § 1211.

It is not inconsistent with this policy for the government, through its negotiation and administration of contracts, to eliminate excessive profits other than by the statutory renegotiation provisions. We find, to the contrary, that any and all such provisions designed to supplement the Act's provisions and make it even more difficult for contractors to gain excessive profits are clearly in tune with the Act's purpose to reduce contractor profiteering at the expense of the public coffer.

An examination of the Act itself reveals not only the absence of a specific prohibition against the terms of Article 41 but also an implied recognition that such provisions may be so employed. For example, the Renegotiation Board is specifically authorized to exempt from negotiation "any contract . . . or performance thereunder during a specified period or periods if, in the opinion of the Board, the provisions of the contract are otherwise adequate to prevent excessive profits." 50 App. U.S.C.A. § 1216(d) (3). Surely this indicates no legislative purpose to prohibit all supplemental remedies. Rather it indicates a

---

paid or incurred in the preceding fiscal year with respect to receipts or accruals subject to the provisions of this title . . . over the amount of receipts or accruals subject to the provisions of this title . . . which were received or accrued in such preceding fiscal year, but only to the extent that such excess

did not result from gross inefficiency of the contractor or subcontractor. 50 App.U.S.C.A. § 1213(f) (Supp.1972).

4. The provisions of Article 41 are similar to the limitations imposed by the Vinson-Trammell Act, 10 U.S.C.A. § 7300 et seq., which is likewise applied on a completed contract basis.

legislative awareness not only that an addition of remedies is possible, but that such provisions might be more protective of the public fisc than the Act's provisions. Moreover, had Congress intended to prohibit all profit limitation provisions save those of the Act, it could have adopted specific legislation to that effect. For example, Section 102(e) of the Act expressly provides that the Renegotiation Act suspends the profit limitation provisions of the Vinson-Trammell Act and the Merchant Marine Act of 1936, where both apply to the same contract.[5] A clearer negative inference could not be gleaned than from the absence of an express statutory prohibition applicable to the instant situation.

While it should be clear from the foregoing alone that the Renegotiation Act of 1951 does not prohibit enforcement of Article 41 in the instant case events occurring since the Act's inception furnish further support for that judgment. Rarely can courts find solace in the often conflicting, more often absent, legislative intent embodied in the passage of a statute. The instant case, however, serves as an exception to this general proposition. In 1959, and again in 1962, Congress specifically considered, in connection with proposed amendments to the Renegotiation Act, the Maritime Administration's practice of including Article 41 in its contracts. *See* S.Rep. 1627, 88th Cong.2d Sess., 108 Cong.Rec. 12268 (1962); H.Conf.Rep. 213, 86th Cong.1st Sess., 105 Cong.Rec. 11562 (1959). Indeed in 1962, the Senate voted down an amendment to the Act which would have expressly barred the inclusion of Article 41 in such cases. The arguments advanced in Congress for this amendment were almost identical to those advanced by Kreihs here.[6] It is to Kreihs' misfortune that its arguments

---

5. Section 102 provides in pertinent part: Notwithstanding any agreement to the contrary, the profit-limitation provisions of the Act of March 27, 1934 . . . ., as amended . . . and of section 505 (b) of the Merchant Marine Act, 1936, as amended . . . ., shall not apply . . . to any contract . . . if any of the receipts or accruals therefrom are subject to this title. . . . 50 App.U.S.C.A. § 1212(e) (Supp.1972).

6. The Majority Report in the Senate, as it applied to Article 41, stated as follows: Section 2 of the bill amends the act so as to prevent the départments named in the Renegotiation Act from requiring the insertion of certain profits-limitation provisions in contracts (or subcontracts) which are subject to the Renegotiation Act, or would be subject to the act except for the exemption provisions of the act. This amendment is essentially the same as a provision previously passed by the Senate in 1959 (sec. 2 of H.R. 7086, 86th Cong., 1st. sess., as passed by the Senate). Although the provision previously passed was eliminated in conference, the conferees made it clear in their report that no adverse inference was to be drawn from its not being agreed to and directed that the amendment be made a part of the study of renegotiation by the Joint Committee on Internal Revenue Taxation. It was concluded in that study that "the procurement agencies have been using, and desire to continue using these nonstatutory profit limitations to achieve results which are precisely those which it is the policy of the Renegotiation Act to prevent." It was further concluded in that study, after careful reexamination of the subject, that the reasons which led to Senate adoption of the provision in 1959 are as applicable now as they were then. Those reasons, as stated in the Senate floor debate in 1959, are set forth below.

This amendment is designed to prevent the Government agencies from employing certain profit limitation devices which undermine the will of Congress as expressed in the Renegotiation Act of 1951. There are at least three instances in which administrative agencies, through regulatory action, are subjecting contracts to these profit limitations even though the same contracts are subject to renegotiation.

(1) The Federal Maritime Administration (and Federal Maritime Board) requires that all ship repair contracts contain a clause (art. 41) which requires a contractor to repay to the Federal Maritime Administration any profits on the contract which exceed 10 percent of the contract price.

. . . . .

A brief consideration of the nature of renegotiation shows that these types of profit limitations are inconsistent in several respects with the type of profit

limitation decided upon by Congress when it adopted renegotiation. The Renegotiation Act empowers the Government, acting through an independent agency known as the Renegotiation Board, to require a contractor to repay to the U.S. Treasury any profits earned on renegotiable Government contracts which, in the judgment of the Board, are excessive for the fiscal year involved. This type of profit limitation differs radically from that involved in the provisions described above.

(1) Renegotiation is not conducted on a contract-by-contract basis but on an overall fiscal year basis. In other words, if a contractor holds several renegotiable Government contracts the question of whether he has earned excessive profits is not determined by reference to each individual contract but is determined with respect to his aggregate profits during a fiscal year on all the contracts, with the result that losses or deficiencies in reasonable profits on one contract may be offset against excessive profits on another contract.

(2) In the renegotiation process, the determination of excessive profits is not made by a contracting officer or any other official in the contracting agency, but is made by an independent official on the Renegotiation Board. The Renegotiation Act itself fortifies this procedure by prohibiting the Board from delegating any of its powers to any person in any agency who is responsible for making procurement contracts for that agency.

(3) Under renegotiation, amounts which are determined to be excessive profits are required to be paid into the surplus fund of the U.S. Treasury and not to the agency which made the contract. The requirement that excessive profits be paid to the Treasury rather than to the contracting agency involved has the desirable effect of preventing contracting officers from relying on renegotiation or any other after-the-fact profit limitation device in establishing the original terms of the contract.

(4) Renegotiation does not establish an arbitrary flat rate profit limitation on all contracts but requires the Renegotiation Board, in determining excessive profits, to take into account numerous factors which may vary among different contracts and contractors.

When Congress adopted renegotiation, it had before it a considerabe amount of prior experience with other forms of profit limitations similar to some of those described above which are currently being employed by regulatory action of administrative agencies, and in view of the various shortcomings of such other forms of profit limitations it rejected them in favor of renegotiation. For example, the Merchant Marine Act of 1936 and the Vinson-Trammell Act of 1934 contained flat rate profit limitations of 10 and 12 percent of the contract price in the case of ship construction and aircraft construction contracts, respectively, and required contractors holding such contracts to repay any profits in excess of the limit to the contracting agency involved. Congress provided, however, in section 102(c) of the Renegotiation Act that the profit limitation provisions of those two acts be suspended so long as renegotiation is in effect. Despite the fact that Congress expressly indicated its intention to suspend such other types of profit limitations and despite the fact that the other types of profit limitations described above are inconsistent with the renegotiation process, some of the administrative agencies have, in effect, nullified the congressional policy by employing profit limitation devices other than renegotiation, even though the contracts to which the other profit limitations are applied, are at the same time, subject to renegotiation.

In order to prevent the renegotiation authority from being weakened and to prevent the will of Congress from being circumvented by such administrative action, this amendment prohibits use of the type of profit limitations described above so long as the Renegotiation Act is in effect.

Your committee believes that those considerations are still sound. Because of these considerations and the various considerations developed in the course of the study referred to above, your committee has adoped the provisions of section 2 of this bill.

The Minority Report, on the other hand, which evidently was ultimately persuasive stated:

(3) Section 2 of the bill would amend section 104 of the Renegotiation Act to prohibit profit limitation provisions in Government contracts.

In Government ship-construction and ship-repair contracts, there have been provisions which limit profits under price escalation clauses. The Maritime Administration believes that this practice is sound and is beneficial to the Government. The practice should not be upset without more consideration than has been given to this question by the majority.

were not given a more receptive hearing in Congress. This Court cannot substitute its judgment for that of Congress, especially where, as here, the intent of Congress speaks so loudly.

Affirmed.